Calvin BOND, et al., Plaintiffs,

v.

ABBOTT LABORATORIES, Defendant.

No. 1:95–CV–2755.

United States District Court,
N.D. Ohio,
Eastern Division.

July 8, 1998.

Lisa M. Mezzetti, Cohen, Milstein, Hausfeld & Toll, Washington, DC, J. Eric Fleischauer, Marc L. Fleischauer, Mansfield, OH, for Plaintiffs.

Ronald S. Okada, Paul P. Eyre, Marcia E. Marsteller, Baker & Hostetler, Cleveland, OH, for Defendant.

## MEMORANDUM OPINION

GWIN, District Judge.

On April 6, 1998, Defendant Abbott Laboratories filed for summary judgment in this class action brought under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. [Doc. 92]. The defendant employer argues it is entitled to judgment because the two named plaintiffs, Calvin Bond and Cathy Bishop, did not have a serious health condition before the defendant suspended Bishop and terminated Bond for absenteeism.

On August 14, 1997, the defendant also filed a motion to dismiss as moot a class claim for injunctive relief [Doc. 72]. Defendant argues that the class claim now is moot because of a revision to Abbott Laborato-

ries's Attendance Control Program. Plaintiffs concede the class claim is moot, but insist they should be awarded attorney fees and costs as the prevailing party.

The Court first will review the defendant's Attendance Control Program and its recent revision. Since Abbott Laboratories's revision moots the only class claim, the Court will grant the defendant's motion to dismiss the class claim for injunctive relief. The Court will not declare plaintiffs the prevailing party or award fees.

Next the Court will determine whether Bond's tooth extractions and Bishop's tendinitis fell under the Family and Medical Leave Act as serious medical conditions, or whether either plaintiff was incapacitated for at least four days. For the reasons given below, the Court finds Bond and Bishop are not entitled to Family and Medical Leave Act coverage. Therefore, the Court will grant the defendant's motion for summary judgment.

### I. Procedural history

In September 1995, Plaintiffs Bond and Bishop filed a complaint against Defendant Abbott Laboratories. In the complaint, the plaintiffs requested class relief against Abbott, claiming that the defendant's Attendance Control Program at its Ashland, Ohio, facility violated the Family and Medical Leave Act. Plaintiffs requested certification of two plaintiff classes.

On May 30, 1997, the Court determined that plaintiffs could maintain this suit as a class action, but only "with respect to the question whether Abbott's Attendance Control Policy violates the FMLA on its face." The Court then certified the following plaintiff class [1] for purposes of injunctive relief only:

"[t]he issue of whether the Ashland program violates the FMLA on its face is common to all class one members," as was the issue of plaintiff's request for injunctive relief. The Court concluded that Bishop's claim was typical of the class, and that she would adequately represent the class. The Court also found that certification was appropriate under either Fed.R.Civ. P. 23(b)(1) or (2) because prosecution of independent claims by individual class members might lead to inconsistent results, establishing incompatible standards of conduct for the defendant

---

1. The Court determined that plaintiffs had met each of the requirements of Fed.R.Civ.P. 23 with respect to the first proposed class. Both the magistrate judge and the Honorable Judge Lesley Brooks Wells found that Plaintiff Bishop was a current union employee at the Ashland plant who was subject to the Attendance Control Program. Therefore, she was a member of the first class. This class includes approximately 400 hourly employees at the plant, and the Court found joinder was impracticable. The Court also determined

[a]ll "eligible employees" of Abbott Laboratories, within the meaning of the Family and Medical Leave Act, to whom its Ashland, Ohio plant's Attendance Control Program applies.

## II.  Factual background

The defendant's Ashland facility manufactures rubber and plastic products for the pharmaceutical and medical industries.  The defendant employs approximately 400 unionized production and maintenance employees there.  A collective bargaining agreement between Abbott Ashland and the union governs the terms and conditions of employment for the union employees.  With respect to the Family and Medical Leave Act, the collective bargaining agreement says:

> The COMPANY and UNION agree that this Agreement shall be administered in compliance with the Family and Medical Leave Act of 1993 (the "FMLA").  Any employee who wishes to do so, may elect a leave in accordance with the FMLA. The terms of, and procedures for electing, any such leave shall be as described in the FMLA and the regulations issued thereunder.  In the event of conflict between the terms of this Agreement and the FMLA (and regulations issued thereunder), the FMLA and related regulations shall govern.

The defendant developed the Attendance Control Program in consultation with the union.  Defendant claims the Attendance Control Program is administered so as to provide employees with more protection than the Family and Medical Leave Act requires.

Under this Attendance Control Program, absences are considered "excused" or "unexcused."  Only certain unexcused absences result in successive levels of discipline.  Under the terms of the Attendance Control Program, Defendant Abbott automatically excuses an employee's first four periods of absence within a rolling twelve-month period when the employee submits a medical excuse cov-

ering the absence.  Abbott completely excuses these "Automatically Excused Absences" without considering the duration, nature or seriousness of the medical condition involved or the circumstances of the absence.  Even absences that do not qualify under the FMLA are excused as "Automatically Excused Absences" under the Attendance Control Program.

After the first four periods of absence, a doctor's statement does not automatically excuse an employee's absence.  After the first four periods of absence, Abbott supervisors or labor relations officials may excuse absences, even absences that do not qualify for protection under the FMLA. Record evidence shows the defendant will excuse absences when an employee is ill (with or without a doctor's note), or provides an adequate explanation of a personal reason for the absence.  Even when an employee is late, supervisors or labor relations officials often excuse the absence merely upon the employee presenting a good reason as to cause.  When an employee is absent for a medical reason for an extended period of time, Abbott will excuse the employee on a "leave of absence" basis or extended "sick leave."

Only unexcused absences may result in discipline under the Attendance Control Program.  An employee is subject to progressive discipline (counseling, verbal warning, written warning, suspension and termination) only after the employee has two unexcused absences in one month or one unexcused absence in each of two consecutive months. Under the Attendance Control Program, an employee can have an unlimited number of excused absences or take an unexcused absence every other month and still not be subject to any discipline.

## III.  Abbott's amendment of policy and claim for class relief

■  After this action was filed, Defendant Abbott revised its attendance program.  Abbott says it made its revision to clarify its policy and to avoid further litigating whether

---

company, and that Abbott "acted on grounds generally applicable to the class" when applying the Attendance Control Program to the class members.  The Court noted this class did not include individualized damage awards.

The Court also determined that the second class sought to be certified was defined based on the merits of the plaintiffs' claims, and could not be certified without an improper preliminary inquiry into the merits of the action.

the Attendance Control Program complies with the requirements of the Family and Medical Leave Act. In this revision, Abbott added the following language:

### Attendance Control Program

1. All time missed will count in the attendance program except the following:

   a. Absences which qualify for leave in accordance with the Family and Medical Leave Act of 1993. (See Ashland Union FMLA Policy.)

   b. Absences which do not qualify for leave in accordance with the Family and Medical Leave Act of 1993, but which are accompanied by a legitimate doctor's statement. The Company will excuse a maximum of four such absences during a rotating 12 month period.

In addition, Abbott's Ashland facility proposes to implement a separate Family and Medical Leave of Absence Policy, which further clarifies its employees' rights under the Family and Medical Leave Act.

The only remaining class issue in this case is whether the Attendance Control Program violates the FMLA on its face. Defendant Abbott moves to dismiss plaintiffs' class claim for injunctive relief for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1).

In *Cotton v. Mansour*, 863 F.2d 1241 (6th Cir.1988), *cert. denied sub nom. Cotton v. Babcock*, 493 U.S. 1042, 110 S.Ct. 835, 107 L.Ed.2d 831 (1990), the Sixth Circuit discussed whether subsequent acts of a party would make injunctive relief inappropriate. In *Cotton*, the court found that acts of the defendant rendered moot the plaintiff's claim for injunctive relief. There, the plaintiff had claimed that the defendant's policies regarding food stamp allotment were improper. *Id.* at 1242. However, the defendant "had clearly changed its policy of calculation" for food stamp allotment, so the court found that there was no ongoing violation to enjoin and that the plaintiff's claim for injunctive relief was properly dismissed as moot. *Id.* at 1244–45.

Abbott modified the language of the Attendance Control Program, and that revision was implemented earlier this year. The union did not object to the revised attendance program. Plaintiffs still argue the motion should be denied unless the Court declares plaintiffs the prevailing party and awards attorney's fees and costs.

The defendant's implementation of the new program and policy render moot plaintiffs' class claim for injunctive relief. The revision clarifies that any leave qualifying under the Family and Medical Leave Act is an excused absence that will not trigger discipline under the Attendance Control Program. The revision also restates the defendant's policy on "Automatically Excused Absences." Leave outside the Act's coverage, but still covered by a legitimate doctor's note, is an excused absence that will not trigger discipline under the Attendance Control Program, and the first four absences of this nature are automatic during any twelve-month period. Therefore, the Court will grant the defendant's motion and dismiss plaintiffs' class claim for injunctive relief.

■ The Court will not declare the plaintiffs the prevailing party. A prevailing party must have altered the legal relationship between the parties, even if it did not receive judgment in its favor, or at a minimum a voluntary change in a defendant's conduct. *See Payne v. Board of Education, Cleveland City Schools*, 88 F.3d 392, 397 (6th Cir.1996); *Kerr v. Vick*, 986 F.2d 1421 (TABLE), No. 92–3272, 1993 WL 43932, *3–4 (6th Cir.1993)(unpublished); *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1173–74 (6th Cir.1990). *But see, McDonnell v. Miller Oil Co., Inc.*, 968 F.Supp. 288 (E.D.Va.1997) (attorney fees mandatory when FMLA plaintiff wins any judgment), *remanded*, 134 F.3d 638 (4th Cir.1998).

The revision does not indicate a change in the defendant's conduct—Abbott's practice of exempting leave qualifying under the Family and Medical Leave Act from the disciplinary reach of its Attendance Control Program. As indicated, before this suit Defendant Abbott had agreed to a contract requiring: "Any employee who wishes to do so, may

elect a leave in accordance with the FMLA. The terms of, and procedures for electing, any such leave shall be as described in the FMLA and the regulations issued thereunder."

■ The Court views the 1998 revision as a clarification in language, rather than a change in policy. In view of the Court's disposition of the claims of the named plaintiffs, an award of attorney's fees and costs to the plaintiffs because this lawsuit lead to a policy clarification, would be inappropriate.

## IV. Work history of named plaintiffs

Defendant Abbott claims that neither Plaintiff Bond nor Plaintiff Bishop can claim coverage under the Family and Medical Leave Act. Abbott says the named plaintiffs did not have a serious health condition, and that Bond and Bishop were not incapacitated for at least four days as required by the Act.

Abbott hired Plaintiff Bond on September 10, 1985. Bond's performance and attendance were less than exemplary. Bond was disciplined on 17 separate occasions between 1986 and 1995. Between 1986 and 1992, Bond was disciplined an additional five times for excessive absenteeism. His absenteeism eventually resulted in verbal and written warnings in June 1993, a suspension in November 1993, and a "last chance" agreement in July 1994.[2]

During a portion of his shift on May 8 and on May 9 and May 10, 1995, Bond was absent from work. Bond submitted notes to the effect that he had a toothache. He claimed that he had three teeth extracted on May 9. Abbott did not excuse these absences. On May 11, 1995, Abbott suspended Bond pursuant to the terms of Bond's "last chance" agreement. On June 5, 1995, Abbott terminated Bond's employment.

The defendant hired Plaintiff Cathy Bishop in May 1987. In 1993, Bishop developed an attendance problem that resulted in counseling in January, a verbal warning in July, a written warning in September, and a waived suspension in October.[3]

2. Despite discipline for excessive absenteeism, Bond continued to have poor attendance. From August 1992 through November 1993, Bond received counseling, a verbal warning, a written warning, and a waived suspension under the Attendance Control Program. This discipline was based on unexcused absences. Bond's "Automatically Excused Absences" in no way contributed to his discipline under the Attendance Control Program.

Bond's counseling on August 28, 1992 was the result of two unexcused absences that qualified for discipline under the Attendance Control Program. After Bond received counseling regarding his unexcused absences, he was absent seven more times before receiving a verbal warning under the Attendance Control Program. Abbott excused two of the absences as medical/excused absences, and one of the absences as a personal/excused absence. However, Abbott did not excuse three of the absences, two of which occurred in consecutive months, because Bond failed to provide an adequate explanation as to why he was absent on those days. As a result, Bond received a verbal warning on June 2, 1993.

Despite the verbal warning on June 2, 1993, Bond again was absent without explanation on June 14, 1993. After this unexcused absence, Abbott gave Bond a written warning on June 15, 1993, as this was Bond's third unexcused absence in one month.

Thereafter, Bond was absent four more times between June 14, 1993 and November 1, 1993. Abbott excused one of these absences as a personal/excused absence. However, due to Bond's lack of an explanation regarding the other absences (on October 4, October 5, and October 14) Abbott did not excuse the absences and suspended Bond on November 1, 1993.

After Bond's suspension, he was informed that two more unexcused absences within one month or two consecutive months could subject him to discharge. However, that warning did not stop Bond from acquiring nine more absences in the next eight months. Abbott excused five of these nine absences. The remaining four, however, were without explanation or excuse and, therefore, unexcused. Two of these unexcused absences were in consecutive months and could have resulted in Bond's discharge. However, Bond made a personal plea for leniency to the plant's general manager. Despite the fact that the Attendance Control Program expressly discontinued the practice of "last chance" letters, Bond was permitted to sign such a "last chance" letter on July 26, 1994. Under the terms of the "last chance" letter, Bond agreed that he could be terminated if he had even one unexcused absence within the following 18 months.

3. Bishop's counseling on January 14, 1993 was the result of an unexcused absence in each of two consecutive months. There is testimony in the record that Abbott did not excuse these two absences because Bishop provided no medical excuse or any other explanation.

After Bishop received counseling in January 1993, she was absent 18 more times before she received a verbal warning on July 12, 1993.

After this waived suspension,[4] Bishop was absent 19 more times. On April 19, 1995 Abbott terminated her employment. Bishop provided medical excuses for seven of these absences, and Abbott accepted them. Abbott also excused a late absence on November 5, 1993 and excused Bishop's absence on January 14, 1994 as a personal/excused absence. (Had Bishop's supervisor not excused her absence on January 14, the defendant says she would have been terminated.)

Abbott did not excuse six of the remaining absences because Bishop provided no medical excuse or explanation. As for the remaining four absences (on March 29, March 30, March 31, and April 7), Bishop presented a medical excuse from her doctor (Dr. Roemer) that said Bishop was to work a "light duty" job between March 29 through April 12, 1995. Dr. Roemer did not say that Bishop could not work.

Abbott did not excuse Bishop's absences on March 29, March 30 and March 31. On April 19, 1995, Abbott terminated Bishop's employment. However, Abbott agreed to reinstate Bishop and give her another chance. Defendant Abbott agreed to reinstate Bishop after consulting with the union and because she suffered the injury to her right arm at work. Defendant Abbott reduced Bishop's termination to a suspension.

## V. Summary judgment standard

Defendant Abbott Laboratories moves for summary judgment on plaintiffs' claims their absences due to dental and tendinitis conditions were covered under the Family and Medical Leave Act. Pursuant to Fed.R.Civ.P. 56, summary judgment shall be rendered if the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In assessing the merits of the motion, this court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the nonmoving party. *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 414, 139 L.Ed.2d 317 (1997).

However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 258–59 (6th Cir.1998).

Accordingly, viewing the evidence in the light most favorable to the nonmoving parties (Bond and Bishop), the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505.

## VI. The Family and Medical Leave Act

■ In 1993, Congress enacted the Family and Medical Leave Act. The Act was designed to balance the demands of the workplace with the needs of families. 29 U.S.C. § 2601(b). The Act entitles covered employees the right to take up to twelve weeks of unpaid leave per year for one or more of the following reasons:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

After receiving her verbal warning, Bishop was absent again on August 10 and August 11, 1993 without explanation. Although Abbott could have given her a written warning for these two unexcused absences in one month, Abbott did not do so. However, Bishop then had another unexcused absence on September 17, 1993. Thereafter, Abbott gave Bishop a written warning.

On October 5 and October 20, 1993, Bishop incurred two more unexcused absences resulting in a suspension under the Attendance Control Program. Abbott waived Bishop's suspension and permitted her to continue working after informing her that the next two unexcused absences in one month or two consecutive months could result in termination.

4. Defense testimony indicates that, as a matter of practice, all suspensions are waived unless the employee specifically requests to have the suspended time off.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612. The Act prohibits an employer from discriminating against an employee who has used FMLA leave. 29 U.S.C. § 2615(a)(2); *see Mell v. Weyburn–Bartel, Inc.,* No. 1:96–CV–654, 1997 WL 626093, at *2 (W.D.Mich.1997).

The legislative history indicates that the FMLA "is not intended to cover short-term conditions for which treatment and recovery are very brief." S.Rep. No. 3, 103d Cong., 1st Sess. (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 30. These types of conditions typically fall within an employer's sick leave policy. The Senate Report specifically refers to conditions such as heart attacks, cancers, strokes, spinal injuries, and appendicitis as falling within the purview of a serious health condition. *Mell,* 1997 WL 626093, at *3.

> The law is clear that:
>
> Congress did not intend to include within the FMLA's protections "minor illnesses which last only a few days and surgical procedures which typically do not require hospitalization and require only a brief recovery period." ... The slings and arrows of everyday life, in Congress' view, should not be the stuff of a federal statute, nor federal litigation based on it. Rather, Congress believed that quotidian afflictions like the common cold or flu should "be covered by even the most modest of employer sick leave policies" and chose not to legislate in that area.

*Olsen v. Ohio Edison Co.,* 979 F.Supp. 1159, 1163 (N.D.Ohio 1997) (internal citations omitted). As the *Olsen* court stated, "[o]bviously, Congress did not intend for an employee to stand on his or her FMLA rights whenever a need for aspirin or cold tablets arose." *Id.*

A plaintiff who has not been an inpatient but who claims to have suffered a "serious health condition" under the FMLA must "make a two-pronged showing of both an incapacity requiring absence from work and continuing treatment." *Id.* at 1164. A plaintiff "must first demonstrate that he suffered from a period of incapacity within the meaning of that regulation ... [because] ... this is the threshold consideration." *Id.* The plaintiff then must show that the period of incapacity was required to be at least four consecutive days. *Murray v. Red Kap Indus.,* 124 F.3d 695, 698 (5th Cir.1997). "[I]t is only where an incapacity is shown that the Court need proceed to a consideration of whether the employee received 'continuing treatment' within the meaning of the Act." *Olsen,* 979 F.Supp. at 1164–65.

If a plaintiff cannot show that he or she had a condition that incapacitated him or her, "the Court's inquiry is over and summary judgment is appropriate." *Id.* at 1164.

The Department of Labor regulations use a bright line test in determining when an employee is suffering from a "serious health condition." *See Mell,* 1997 WL 626093 at *4; *Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028, 1036 (M.D.Tenn.1995). This test is set forth at 29 C.F.R. § 825.114. The pertinent portions of this regulation are as follows:

> (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
>
> \*       \*       \*       \*       \*       \*
>
> (2) *Continuing treatment* by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
> (i) A period of *incapacity* (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity re-

lating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

The final regulations[5] shed light on the minor and short-term conditions which are not covered under the FMLA. 29 C.F.R. § 825.114(c). Courts too have found that Congress never intended many illnesses and procedures to be covered under the Act. *See, e.g., Olsen,* 979 F.Supp. at 1163 (arthritis and backaches generally not covered); *Bauer v. Varity Dayton–Walther Corp.,* 118 F.3d 1109 (6th Cir.1997) (hematochezia, i.e., rectal bleeding, not covered); *Mell,* 1997 WL 626093 (flu is specifically excluded from FMLA coverage); *Brannon,* 897 F.Supp. 1028 (gastroenteritis and upper respiratory infection not covered); *Seidle v. Provident Mut. Life Ins. Co.,* 871 F.Supp. 238 (E.D.Pa. 1994) (ear infection not covered).

### VII. Discussion of FMLA claims

■ Determining whether an illness qualifies as a "serious health condition" for purposes of the Family and Medical Leave Act is a legal question that a plaintiff may not avoid "simply by alleging it to be so." *Carter v. Rental Uniform Serv. of Culpeper, Inc.,* 977 F.Supp. 753, 761 (W.D.Va.1997).

As explained in *Olsen*

[that a plaintiff was "required" to be incapacitated for more than three days] does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient

for the employee to have to work. Rather, it means that a "health care provider" has determined that, in his or her professional medical judgment, the employee cannot work (or could not have worked) because of the illness. If it were otherwise, a note from a spouse, parent, or even one's own claim that one cannot work because of illness would suffice. Given the legislative history surrounding its enactment, the FMLA cannot be understood to establish such liberal standards for its application.

*Olsen,* 979 F.Supp. at 1166 (internal citation omitted). Generally then, a health care provider must instruct, recommend, or at least authorize an employee not to work for at least four consecutive days for that employee to be considered incapacitated for the required period of time under the FMLA. *Id.*

■ To establish a *prima facie* case under the Family and Medical Leave Act, a plaintiff also must show that: (1) he availed himself of a protected Family and Medical Leave Act right, (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the two actions. *Morgan v. Hilti, Inc.,* 108 F.3d 1319 (10th Cir. 1997). Plaintiff Bond contests his termination, and Plaintiff Bishop claims she was adversely affected by her nearly one-month suspension.

Plaintiff's argument involves applying 29 C.F.R. § 825.114(c) to Bond's condition. This section states in pertinent part as follows:

*Ordinarily, unless complications arise,* ... routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of serious health condition and do not qualify for FMLA leave. (Emphasis added.)

Bond maintains that his condition was a "complication" of routine dental or orthodontia problems. However, his dentist's deposition does not advance Bond's claim. Dr. Pitts specifically was asked:

5. The final regulations had an initial effective date of February 6, 1995 (60 Fed.Reg. 2180(1995)). This effective date was subsequently deferred to April 6, 1995 (60 Fed.Reg. 6658 (1995)). Because both Bond and Bishop were

terminated after this effective date, the final regulations are applicable to this action. *See Olsen v. Ohio Edison Co.,* 979 F.Supp. 1159 n. 6 (N.D.Ohio 1997).

Q. In your view, was there anything unusual about the extractions you performed for Mr. Bond?

A. No, they were routine extractions.

(Pitts dep. at 29:22–24).

However, Dr. Pitts also said that the treatment he provided to Calvin Bond was "emergency treatment." He classified it as an "emergency" in part because Bond was in "severe pain" when he came to the office:

Q: What was the underlying diagnosis in this case, or what was your understanding as to what was causing Mr. Bond's pain at the time he came to your office?

A: Severe bone loss and decayed teeth.... [I]n this case he had severely broken down teeth, plus he had a gum and bone problem. What that means is he had a loss of, a bone loss from his teeth so his teeth were mobile, plus he had decay on top of that, and his teeth just couldn't take anymore.

\*   \*   \*   \*   \*   \*

A: He had infection from bone loss and the tartar build up, and then you're going to have pain.

(Pitts dep. at 33).

■ The Court finds Bond's position without merit.

The dentist described Bond's dental problem as "routine." Dr. Pitts stated under oath that the extraction was completely without complication. Bond does not raise a material factual issue whether his dental surgery presented complications outside of pain. The regulations specifically exempt most dental problems from FMLA coverage. *See* 29 C.F.R. § 825.114(c). The Court finds that such a routine dental problem is not a serious health condition under the Act.

■ Bishop too has no claim to a "serious health condition." She received no instruction, recommendation, or authorization from a health care provider that she should absent herself from work for at least four consecutive days because of her tendinitis. Bishop's own doctor did not recommend that she stay home from work. Instead, he advised Bishop that she could go to work and perform light duty.

Even if the regulations specifically did not exempt Bond's routine dental problems or Bishop's tendinitis from FMLA coverage, the Court finds these plaintiffs also would not be covered under the Act because they were not incapacitated for more than three days. In determining "incapacity," the Court must inquire whether the condition required the plaintiff to be absent from work for more than three days. *Olsen,* 979 F.Supp. at 1165; *Brannon,* 897 F.Supp. at 1037.

Bond claims four days of incapacity (May 6–9). He also claims to have met the additional requirement of 29 C.F.R. § 825.114(a)(2)(i)(A), or treatment "two or more times by a health care provider." [6]

Dr. Pitts only excused Bond from work for two calendar days (May 9 and May 10). Bond was absent from work during portions

---

**6.** Bond's tooth pain began on May 6, 1995, a day the plaintiff was not scheduled to work. Bond did not obtain treatment on that date. On May 7, 1995, Bond initially saw a doctor, who advised Bond to see a dentist. The doctor also prescribed Darvocet for pain and amoxicillin for infection. Throughout May 7, Bond claims he was unable to perform his regular daily activities. However, later that day he reported to work at his normal start time of 11:00 p.m. His pain was sufficiently intense that he left work after a short time.

After leaving work, Bond went to a hospital emergency room, where he received a pain injection. He was instructed not to return to work until his next shift began, at 11:00 p.m. on May 8. When the pain continued, Bond returned to the hospital in the afternoon. He was given another pain shot, and this time instructed not to return to work until his shift started on May 10.

On May 8, May 9 and May 10, 1995, the days when Bond purportedly was too sick to work, he was seen outside the plant talking to a co-worker. On May 9, 1995, Bond actually called his supervisor from inside the plant to tell the supervisor that he could not come to work.

On May 9, 1995, Bond twice saw Dr. Mark Pitts, a dentist. He first saw Dr. Pitts at approximately noon, when he received novocaine. Bond returned at 4:00 p.m. and received another shot of novocaine and had two teeth extracted. Dr. Pitts instructed Bond not to return to work until May 11, 1995. Bond returned to work on May 10 at the beginning of his shift at 11:00 p.m. He was suspended when the shift ended.

of his shift on May 8, May 9 and May 10, 1995. Obviously Bond did not take off work on May 6 or May 7, because he was not scheduled to work on those days. Bond's testimony is that he was unable to perform his regular daily activities on either May 6 or May 7. There is nothing in the record to support that contention outside of Bond's self-serving statement.

Bond cannot show a period of incapacity exceeding three calendar days that was due to a serious health condition. Under these circumstances, Bond was not incapacitated under the Family and Medical Leave Act. Therefore, Bond did not have a serious health condition under the FMLA, and Abbott is entitled to summary judgment.

Plaintiff Cathy Bishop says her absences on March 29, March 30, and March 31 were protected as a chronic condition (29 C.F.R. § 825.114(a)(2)(iii)) [7] and as "continuing treatment" (29 C.F.R. § 825.114(a)(2)(i)).

Bishop admits that she was actually absent from work for only three consecutive days (March 29, March 30 and March 31, 1995) not the four consecutive days required under that section of the regulations which Abbott argues applies to both Bishop and Bond.

Bishop argues alternatively that even if her condition is not analyzed as chronic, the evidence establishes that she had a period of incapacity which exceeded three days. She points to the parenthetical definition of incapacity contained within 29 C.F.R. § 825.114(a)(2)(i):

(i) A period of incapacity (i.e., inability to work, attend school or *perform other regular daily activities* due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days ... (emphasis added.)

Bishop says she was not scheduled to work on April 1 or April 2, 1995, and the fact those were days off is irrelevant to the seriousness of her health condition. While she claims the issue is whether she was able to perform her "regular daily activities" on those days, Bishop admits in her affidavit that she did not know what she did on two days where she was not scheduled to work—April 1 and April 2, 1995.

Like the plaintiff in *Olsen*, Bishop merely decided on her own not to come to work for the light duty her doctor recommended. *See also, Brannon,* 897 F.Supp. at 1037 (plaintiff's own testimony that she was too sick to come to work insufficient to prove absence was necessary). Only after Bishop made this decision did she submit the second excuse from her doctor, which retroactively excused her for the absences, even though the doctor had not seen her since he had issued the first excuse.

This "after-the-fact" excuse is not sufficient evidence that Bishop's doctor ordered her to stay home from work due to her

---

**7.** (iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

    (A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

    (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

    (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

    \*    \*    \*    \*    \*    \*

    (b) Treatment for purposes of paragraph (a) of this section includes (but is not limited to) examination to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen).

    \*    \*    \*    \*    \*    \*

    (e) Absences attributable to incapacity under paragraphs (a)(2)(ii) or (iii) qualify for FMLA leave even though the employee or the immediate family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three days. For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack or because the employee's health care provider has advised the employee to stay home when the pollen count exceeds a certain level. An employee who is pregnant may be unable to report to work because of severe morning sickness.

condition. *See id.* (after not recommending plaintiff miss work at all, doctor's after-the-fact statement that it was reasonable for plaintiff to have missed work was insufficient evidence of serious health condition).

Bishop does argue there is no requirement that an employee be incapacitated for more than three days, if that employee is suffering from a chronic health condition. She points to the testimony of her doctor that Bishop does in fact fit the "chronic serious health condition" branch of the FMLA regulations.

In March 1995, Bishop was suffering from tendinitis of the right elbow, muscle sprain of the right side of the neck, and muscle strain of the trapezius muscle. Dr. Roemer initially advised Bishop to work light duty until April 12, 1995. When she subsequently reported that her symptoms had increased in severity, he excused her from work on March 29, March 30, and March 31. Even at the time of the initial treatment, her doctor felt that she would "need periodic treatment, that the condition would continue over an extended period of time, and that it would cause either continuing or episodic incapacity." (Roemer affidavit at ¶ 6). Bishop says she met the three prongs of a chronic serious health condition set out at 29 C.F.R. § 825.114(a)(2)(iii).

The Court does not believe Bishop has raised a material issue of fact, however. The physician's cited statement is more speculation than diagnosis. *See Brannon,* 897 F.Supp. at 1037 (doctor did not advise plaintiff to remain off work and his statement that it was reasonable for someone to miss three or four days for her illness was speculation). Further, the doctor did not say that any future incapacity would meet the definition of a serious health condition under the Family and Medical Leave Act. *Id.* The record is clear that Bishop had a doctor's note that was not an excuse from work, but a notice that she could only do light work. Plaintiff instead chose on her own to take off work.

Bishop cannot show a period of incapacity due to a serious health condition under the Family and Medical Leave Act. Under these circumstances, Bishop was not incapacitated under the FMLA. Therefore, Bishop did not have a serious health condition under the FMLA, and Abbott is entitled to summary judgment.

The Court finds that a reasonable fact finder could not find that a material dispute exists on whether Plaintiff Bond or Plaintiff Bishop had a serious health condition during the time period relevant to this suit. Neither Bond's tooth extraction nor Bishop's tendinitis are qualifying illnesses under the Act. Neither plaintiff can show they met the statutory period for incapacity. Summary judgment in favor of the defendant is required in the case of the two named plaintiffs.

VIII. Conclusion

For the reasons given above, the Court grants the defendant's motion for summary judgment. The Court also grants the defendant's motion to dismiss as moot a claim for injunctive relief. The Court declines to award fees or costs.

IT IS SO ORDERED.