**Holly POLDERMAN, Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., Defendant.**

**No. 1:97 CV 2483.**

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 27, 1999.

Brent L. English, Law Offices Of Brent L. English, Cleveland, OH, Steven B. Beranek, Middleburg Hts, OH, for Holly Polderman, plaintiff.

Earl M. Leiken, Baker & Hostetler, Cleveland, OH, for Northwest Airlines, Inc., defendant.

## MEMORANDUM OPINION AND ORDER

NUGENT, District Judge.

This matter is before the Court on the Motion of Defendant Northwest Airlines, Inc. ("Northwest") for Summary Judgment (Document # 24). For the reasons discussed below, Defendant's Motion for Summary Judgment is granted.

### Procedural History

Plaintiff Holly Polderman filed this action on September 25, 1997, against her former employer, Defendant Northwest, alleging that Northwest terminated her employment in violation of the Americans with Disabilities Act, ("ADA"), 42 U.S.C.A. § 12101 *et seq.* and the Family and Medical Leave Act of 1993, ("FMLA"), as amended, 29 U.S.C.A. § 2601 *et seq.* Plaintiff filed an Amended Complaint on July 31, 1998, adding a third count captioned "Failure to Reasonably Accommodate Plaintiff in Violation of the Americans with Disabilities Act." (Document # 19). Plaintiff alleges that she was diagnosed with depression in November, 1996, which substantially limited one or more of her major life activities. Plaintiff alleges that Defendant was aware of her condition and terminated her because of it in violation of the ADA. Further, Plaintiff alleges that Defendant refused to make reasonable accommodations for Plaintiff's known physical or mental limitations. Plaintiff also alleges that Defendant relied on an instance where Plaintiff's absence from work was covered by the FMLA to support its decision to terminate Plaintiff for absenteeism.

In its Motion for Summary Judgment filed on October 5, 1998, Defendant asserts that Plaintiff has failed to demonstrate her prima facie case under the ADA because she was not disabled as defined by the Act. Moreover, Defendant asserts that it provided the only accommodation that Plaintiff requested. Further, Defendant contends that even if Plaintiff could establish her prima facie case, she cannot show that Defendant's reason for terminating her—absenteeism and lack of dependability—were pretexts for unlawful discrimination.

Additionally, Defendant contends that Plaintiff was not terminated in violation of the FMLA because she did not fulfill the requirements necessary to secure rights under FMLA for the absence in question; and, even if she did, Northwest did not use that absence as a basis for terminating Plaintiff.

Plaintiff filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment and Defendant filed a Reply to Plaintiff's Opposition. The motion is fully briefed and ready for decision.

### Factual Background[1]

Plaintiff was employed as a flight attendant by Northwest from December 22, 1989, to March 6, 1996, when she was discharged. Defendant has a multi-step disciplinary system which is outlined in the Northwest Airlines Performance Development manual ("PDM"). Plaintiff received a first step warning, which is denoted as a Level One Reminder in the PDM, on September 29, 1993. A Level One Reminder can only by issued after an employee calls in sick or is absent more than three times within a twelve month period. The Level One Reminder was issued because Plaintiff had six separate sick calls, three unable to commutes and two unavailables for flight assignment within a twelve month period. A Level One Reminder remains active for nine months.

The second step in the Defendant's multi-step program is a Level Two Reminder, which is applied when an employee has not made the expected improvement or correction of the problem which led to a Level One Reminder which remains active. Only one or two more sick calls or absences could result in a Level Two Reminder after a Level One Reminder has been issued. Plaintiff was issued a Level Two Reminder on May 23, 1994, after she had an additional three sick calls and two additional no shows.

The next step in Defendant's multi-step program is a Decision–Making Leave. At this step the employee is given a day off with pay to contemplate her commitment to her job. A Decision–Making Leave is issued if an employee has not made the expected improvement or correction in a problem performance category for which a Level Two Reminder has been issued and remains active. Plaintiff had two additional absences, a no show and a sick call by May 24, 1995. Plaintiff was placed on Decision–Making Leave on May 24, 1995, which was the next time that she was scheduled to work following the event which triggered the application of the Decision–Making Leave—Plaintiff's May 17, 1995, no show. A Decision–Making Leave remains active for a period of eighteen months. If the problem is not corrected, the next step is termination.

Plaintiff requested a transfer from Detroit to Memphis on June 1, 1995. Plaintiff was a no-show on June 8, 1995, and was absent due to a sick call on June 9, 1995. Following these absences a meeting was held with Plaintiff to discuss the seriousness of the situation. Plaintiff informed Defendant at that time that her problems were being caused by spousal abuse. The Defendant agreed the give Plaintiff an additional opportunity to correct her dependability problem and as-

---

1. The factual summary is based upon the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit or other evidence are stated in the light most favorable to Plaintiff, the non-moving party.

signed her to Northwest's Employee Assistance Program.

Plaintiff began counseling with Nadine Geiger, LISW, for dysthymia—a form of depression. In August, 1995, Plaintiff requested to be transferred back to Detroit from Memphis to facilitate her appointments with Ms. Geiger. Defendant granted Plaintiff's request for transfer on December 13, 1995. After that transfer Plaintiff was a no-show for a flight on January 9, 1996, and on March 5, 1996. Plaintiff argues that the January 9, 1996, no show was caused by a delay in Northwest's flight taking her from Cleveland to Detroit. Plaintiff claims that Defendant refused to allow her to report for duty late and instead considered her a no show. With respect to the March 5, 1996, no show, Plaintiff contends that her attendance at the scheduled training session would have violated Federal Air Regulation 121.467, which requires that flight attendants have a 24 hour period during every seven days when they are off-duty. Plaintiff states that she spoke to a woman in charge of scheduling for Detroit who advised her not to attend the March 5, 1996, training and that her training would be rescheduled.

Plaintiff also had some lengthy absences due to medical problems. These absences from October 15, 1995 through November 3, 1995, and November 24, 1995 through December 12, 1995, are alleged by Plaintiff to be qualified leaves under FMLA. Defendant acknowledges that the October 15, 1995 through November 3, 1995, absence was a qualified FMLA leave but disputes that the November 24, 1995 through December 12, 1995, absence was a qualified FMLA leave. Defendant contends that Plaintiff did not return her medical certification documents for the November–December leave in a timely fashion and that Plaintiff caused great confusion regarding whether the absence was covered by FMLA because she gave three different reasons for the leave.

Defendant terminated Plaintiff on March 5, 1996, after her third no show (and fourth absence) following her Decision–Making Leave.

**Summary Judgment Standard**

Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED.R.CIV.P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), *see also U.S. v. Hodges X–Ray, Inc.,* 759 F.2d 557, 562 (6th Cir.1985).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis,* 57 F.3d 476,

478 (6th Cir.1995) (quoting *Anderson,* at 248–49, 106 S.Ct. 2505 (1986)). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citation omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Department of Transportation,* 53 F.3d 146, 149 (6th Cir.1995). The text of FRCP 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

*Id.* The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate.

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred that, " 'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.' " *Wiley v.*

*U.S.,* 20 F.3d 222 (6th Cir.1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1181 (9th Cir.1988)). Rule 56(e) also has certain, more specific requirements:

> [it] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley,* at 225–26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect. The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249, 106 S.Ct. 2505. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails:

the threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

### Law and Analysis

### I. Plaintiff's ADA Claims

Defendant moves for summary judgment on Plaintiff's ADA claims on the grounds that Plaintiff's evidence fails to establish a prima facie case of discriminatory discharge because she cannot prove that she has a "disability" recognized under the ADA and there is no causal connection between her discharge and her alleged disability. Moreover, Defendant contends that Plaintiff's claim that Defendant failed to accommodate her alleged disability fails because Plaintiff was given the only accommodation that she sought.

Plaintiff responds that she has a covered disability and that she would not have had the absences or no shows which precipitated her termination if she had received the accommodation that she had requested in a more timely manner.

 The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). To defeat an employer's motion for summary judgment in response to an ADA claim, an employee must first make out a prima facie case of discrimination by establishing the following elements: (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775, 779 (6th Cir. 1998) citing *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir. 1996); *See also Keever v. City of Middletown,* 145 F.3d 809, 811, *cert. denied,* —— U.S. ——, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998). If the employee establishes a prima facie case of discrimination "the burden then shifts to the employer to provide a non-discriminatory explanation for the employment decision. If the employer offers what appears to be a legitimate explanation, the employee then has the burden of 'showing that the proffered explanation is pretextual.'" *Cehrs,* 155 F.3d at 779, citing *Monette,* 90 F.3d at 1186.

In this case the only dispute with respect to the prima facie case is whether Plaintiff suffered from a disability recognized by the ADA. "Disability" is defined in the statute in pertinent part as follows:

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Plaintiff asserts that her depression constitutes a mental impairment that substantially limits one or more of her major life activities pursuant to 42 U.S.C. § 12102(2)(A). The issue to be determined here is whether Plaintiff's depression constitutes a mental impairment that substantially limits one or more of her major life activities.

The Sixth Circuit has referred to the regulations promulgated by the Equal Employment Opportunity Commission which further define the scope and reach of the ADA in order to determine the meaning of

"mental impairment" and "substantially limits". The regulations define "a physical or mental impairment" as including "any mental or psychological disorder, such as . . . emotional or mental illness". 29 C.F.R. § 1630.2(h)(2) (1998). A major life activity includes working. 29 C.F.R. § 1630.2(i) (1998).

Defendant does not contend that depression is not a mental impairment. Rather, Defendant contends that Plaintiff's depression was mild and did not substantially limit a major life activity. The regulations provide:

> [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 110 F.3d 369, 372 (6th Cir.1997) *citing* 29 C.F.R. § 1630.2(j)(3)(I). In *McKay,* the Plaintiff had muscle soreness and carpal tunnel syndrome which prevented her from performing her repetitive-motion factory line job. The Sixth Circuit affirmed the District Court's grant of summary judgment in favor of the employer finding that Plaintiff's condition did not significantly restrict Plaintiff's ability to perform either a broad range jobs in various classes or a single class of jobs. "An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Id.* at 373 *quoting Wooten v. Farmland Foods,* 58 F.3d 382, 386 (8th Cir.1995) (*quoting Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994)), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); *Taylor v. United States Postal Service,* 946 F.2d 1214, 1217 (6th Cir. 1991) (impairment "substantially limits" an individual's ability to work only when that impairment significantly decreases his ability to obtain satisfactory employment, and not merely when it interferes with his ability to do a particular job.); *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1249 n. 3 (6th Cir.1985).

■ Plaintiff contends that her depression is a mental impairment which substantially limits one or more of her major life activities. Plaintiff claims that she has suffered chronic depression for several years notwithstanding the fact that it was not diagnosed until the fall of 1995. Plaintiff states in her affidavit that before she was put on Prozac by Dr. Podlipsky and participated in counseling sessions with Nadine Geiger, her depression affected her ability to sleep and function and required her to take over the counter sleep aids an average of four nights every week. (Plaintiff's Aff. at ¶ 5). Plaintiff asserts that her depression prevented her from performing her duties as a flight attendant or any duties that required a significant amount of interaction with the public. (Plaintiff's Aff. at ¶ 6). In her deposition Plaintiff stated: "It was real difficult to be able to go into an airline and put on lipstick and a happy face and be cute to the passengers". (Plaintiff's Dep. at 139).

Defendant counters that Plaintiff has no objective evidence, other than her own testimony, to support her claim of disability. Plaintiff's counselor testified at her deposition that Plaintiff suffered from dysthymia, a "sort of a low grade chronic depression". (Geiger Dep. at 11). Ms. Geiger noted that a person suffering from dysthymia would be sad and get very little pleasure out of life. *Id.* With respect to Plaintiff's condition, Ms. Geiger stated: "However, the thing I want to make very clear is my feeling that Holly's illness was not very severe at all . . . . it did [not] make her unable to perform activities of daily living. She was able to do all that. She wasn't happy, but she was able to do all that." (Geiger Dep. at 37). It was Ms. Geiger's opinion that Plaintiff was functional. When asked to define what she meant

when she said Plaintiff was functional, Ms. Geiger stated:

> Well, what I mean is that, first of all, when she came into my office, she was very appropriately dressed. She was casually dressed, slacks and sweater, but very, very well put together. She was well-groomed. If you saw her at a shopping center, she would look like anybody else at a shopping center. She did things with her mother. She was able to get out. She was able to do things. She went to church every day with her mother. She baby-sat her sister's children. She was able to do things. She was functional. She went out to dinner with her husband. It's not like she was unable to get out of bed in the morning, that she was unable to do anything around the house. She was able to do that. She was functional.

(Geiger Dep. at 17–18). Ms. Geiger further stated that she does not remember specifically asking Plaintiff whether she was able to perform her job, however, she does recall that Plaintiff never told her that she was not able to perform her job. (Geiger Dep. at 37).

Plaintiff states that her depression, which made it hard to "put on lipstick and a happy face and be cute to the passengers", prevented her from performing her job as a flight attendant, or any job that required a significant amount of interaction with the public. This difficulty is not sufficient to demonstrate a "substantial limitation" within the meaning of the ADA. *Olson v. Dubuque Community School Dist.*, 137 F.3d 609, 612 (8th Cir.1998) (citing *EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans with Disabilities Act* § 9 (March 25, 1997)) EEOC Compliance Manual (BNA) ('an individual would be substantially limited ... if his/her relations with others were characterized *on a regular basis by severe problems,* for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.') (Emphasis in original). In short, Plaintiff

has produced no evidence, other than her own testimony, that she was a disabled person within the meaning of the ADA. The testimony of her mental health counselor does not support Plaintiff's contention that she was disabled. Plaintiff's testimony as to her ability to work with the public, without supporting medical testimony, is not sufficient to establish her prima facie case under the ADA. *See Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 392 (S.D.N.Y.1998) and the federal cases cited therein.

While, Plaintiff's absenteeism rate and dependability were not good, Plaintiff did regularly show up for work and completed her shifts, apparently without problems. Moreover, Plaintiff's position that Defendant is somehow estopped from denying that Plaintiff is disabled because she was referred to the employee assistance program for help after disclosing that she was the victim of spousal abuse, is misplaced. Defendant does not dispute that Plaintiff complained of spousal abuse and that Defendant referred her to its employee assistance program for help. That referral does not support Plaintiff's subsequent leaps that Defendant considered Plaintiff's condition to be serious or "substantially limiting" her ability to work. Upon the evidence submitted by Plaintiff, no reasonable jury could find that Plaintiff was disabled within the definition of 42 U.S.C. § 12102(2)(A).

Plaintiff notes that she must demonstrate that she could perform the essential functions of the job with reasonable accommodation as part of her prima facie case. (Plaintiff's Opp. p. 17). Even if Plaintiff had shown that she was disabled within the meaning of the ADA, she does not offer evidence to support her claim that a timely accommodation would have prevented her termination. Plaintiff requested a "hardship" transfer from Memphis to Detroit in August, 1995, two months after receiving her requested transfer from Detroit to Memphis. Plaintiff asserts that the transfer was necessary so that she

could make her regular appointments with her counselor, Nadine Geiger. Defendant granted Plaintiff's hardship transfer effective December 13, 1995, four months after it was requested.

Plaintiff postulates that assuming, *arguendo*, that her previous absences prior to her transfer to Detroit were caused by her depression, and her absences after her transfer were not caused by depression, demonstrates that the reasonable accommodation of timely transfer by Defendant would have allowed Plaintiff to perform her duties without attendance problems. Again, Plaintiff's argument descends into layers and layers of speculation. There is no support for Plaintiff's assertion that all of her absences prior to her transfer to Detroit were caused by her depression. Moreover, transfer to Detroit in August, 1995, would not have facilitated meetings with Ms. Geiger because Plaintiff did not begin counseling with Ms. Geiger until November 14, 1995. In short, Defendant granted Plaintiff the accommodation she requested and Plaintiff obtained her transfer within a month of her first meeting with Ms. Geiger.

Moreover, as Defendant correctly points out, there was no connection between Defendant's failure to transfer Plaintiff in mid-August and her termination because all of the absences and dependability problems occurred before she requested the transfer or after she received the transfer. None of the absences occurred while Plaintiff was awaiting transfer.

 Similarly, Plaintiff's claim that Defendant failed to accommodate her disability by refusing to give her unpaid leave when she could not work because of her disability lacks merit. In order to establish her prima facie case with respect to her failure to accommodate claim Plaintiff must show:

(1) that he is disabled; (2) that he is qualified for the job with or without reasonable accommodation; and (3) that he was denied a reasonable accommodation.

*Penny v. United Parcel Service,* 128 F.3d 408, 414 (6th Cir.1997). As determined above, Plaintiff has not submitted evidence that she was disabled within the meaning of the ADA. Moreover, Plaintiff's deposition testimony shows that the only accommodation Plaintiff ever requested was a transfer to Detroit. (Plaintiff's Dep. at 123). It is up to the employee to request an accommodation. *See* 42 U.S.C. § 12101(2). "Employers are not required to be clairvoyant as to hidden medical problems of their employees and provide assistance where none is requested." *Rogers v. CH2M Hill, Inc.,* 18 F.Supp.2d 1328, 1329 (M.D.Ala.1998) *citing Adams v. Rochester Gen. Hosp.,* 977 F.Supp. 226, 235–36 (W.D.N.Y.1997). Accordingly, since Plaintiff was not disabled within the meaning of the ADA and because she did not request an accommodation of unpaid leave, Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claim.

Since Plaintiff has been unable to show that she has a "disability" as defined in the ADA; and, because even if she had demonstrated that she was disabled, she was given the accommodation she requested and still had dependability problems, Defendant is entitled to summary judgment on Plaintiff's ADA claim.[2]

## II. FMLA Claim

Plaintiff asserts that she was terminated in violation of the FMLA because her discharge notice mentioned a sick absence for the period November 24, 1995 to December 12, 1995. Plaintiff contends that her absence during this period was protected by the FMLA and could not be used as a reason for discharge. Defendant counters

2. Even if Plaintiff had demonstrated her prima facie case, Defendant would still be entitled to summary judgment on Plaintiff's ADA claims because she has not offered evidence

to show that Defendant's stated non-discriminatory reasons for her termination (attendance and dependability problems) were pretextual.

that Plaintiff was not entitled to FMLA leave during her absence from November 24, 1995 to December 12, 1995, because she provided Defendant with inconsistent reasons for her request for leave and failed to provide timely medical certification. Moreover, even if Plaintiff's November 24 to December 12 absence was covered by FMLA, Defendants assert that Plaintiff has not and cannot show that she was discharged because of that leave.

The Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, permits covered employees to take up to twelve weeks of unpaid leave per year for one or more of four reasons including: "(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(D). The Act prohibits an employer from discriminating against an employee who has used FMLA leave. 29 U.S.C. § 2615(a)(2).; *Bond v. Abbott Laboratories*, 7 F.Supp.2d 967, 973 (N.D.Ohio 1998).

■ As with an ADA claim, an employee must establish a prima facie case under the FMLA. The employee must show that: (1) she availed herself of a protected Family and Medical Leave Act right, (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions. *Id.* at 974.

■ For the purposes of this Motion, the Court will presume that Plaintiff's absence from November 24 through December 12, 1995, was a qualified FMLA leave. Even with that presumption, however, Plaintiff has not demonstrated the third element of her prima facie case—that there is a causal connection between her November 24–December 12 leave and her termination. The record before the Court demonstrates that Plaintiff had a three year history of absenteeism and dependability problems which caused her to move through all of Defendant's disciplinary steps to termination. Following her Decision–Making Leave on May 24, 1995,

Plaintiff knew she was on her last chance and that one more absence could lead to her termination. Nevertheless, Plaintiff had three no shows and an absence after her Decision–Making Leave, not including the November 24–December 12 absence. The next step in Defendant's progressive discipline program was termination. No reasonable jury could find that Plaintiff's termination was caused by the November 24–December 12 leave rather than Plaintiff's continuing no shows. In a similar case, a court in the Northern District of Illinois noted:

> In order to show a causal relationship between the protected activity and the adverse action (plaintiff's termination), plaintiff must demonstrate that the basis for her termination was not her excessive absences, but requests for leave under the FMLA leave. Even assuming that plaintiff made numerous requests for leave under the FMLA, no reasonable juror could conclude that the decision to fire her was based on those requests and not her absenteeism. The only evidence plaintiff offers to support her claim is suspicious timing. . . . However, in light of the fact that the [employer] brought plaintiff's excessive absences to her attention well before her FMLA requests, even the timing is not suspicious. Accordingly, plaintiff has not raised a material question of fact as to a causal relationship between her protected activity and termination.

*Dormeyer v. Comerica Bank—Illinois*, No. 96 C 4805, 1998 WL 729591 (N.D.Ill. Oct.14, 1998).

The only connection Plaintiff asserts between her termination and her November 24–December 12, 1995, FMLA leave is her contention that Defendant must have relied on the leave in order to terminate her because her May 24, 1995, Decision–Making Leave was untimely because it occurred more than one year after Plaintiff's Level Two Reminder of May 23, 1994. Accordingly, Plaintiff contends that Defendant should have started Plaintiff's disci-

plinary record anew on June 8, 1995, with her no show of that day. If Plaintiff's disciplinary record were started anew on June 8, 1995, Plaintiff asserts that Defendant must have counted the November 24–December 12, 1995, absence in order to have a sufficient number of disciplinary incidents to terminate Plaintiff on March 6, 1996.

As Defendant demonstrates, however, Plaintiff's May 24, 1995, Decision–Making Leave was timely. The incident which triggered the Decision–Making Leave occurred on May 17, 1995, when Plaintiff was a no show. That incident clearly occurred within a year of Plaintiff's Level Two Reminder, which was issued on May 23, 1994. Plaintiff received the formal Decision–Making Leave on May 24, 1995, which happened to be the next date that Plaintiff was scheduled to work. Moreover, when Plaintiff received the Decision–Making Leave the Teamster's Union and Plaintiff argued that the Decision–Making Leave was without just cause, not that it was untimely. Finally, Northwest's managers testified that they treated the May 24, 1995, as valid and enforceable and did not use the November 24–December 12, 1995, absence as support for Plaintiff's termination. Rather, Plaintiff's termination was triggered by her four absences (three no shows on June 8, 1995, January 9, 1996, and March 5, 1996, and an absence on June 9, 1995) after her Decision–Making Leave. In short, there is no reasonable connection between Plaintiff's request for an FMLA leave and her termination.

### Conclusion

For the reasons set forth above there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law on all counts of Plaintiff's Amended Complaint. Accordingly, Defendant's Motion for Summary Judgment (Document # 24) is GRANTED.

IT IS SO ORDERED.