RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0285P (6th Cir.)
File Name: 00a0285p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JANICE COURTNEY,
        *Plaintiff-Appellant,*

    *v.*

      No. 98-4298

LANDAIR TRANSPORT, INC.,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-00098—Joseph P. Kinneary, District Judge.

Argued: February 1, 2000

Decided and Filed: August 29, 2000

Before: MERRITT, BOGGS, and MOORE, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:** Paige A. Martin, PAIGE A. MARTIN CO.,
L.P.A., Columbus, Ohio, for Appellant. Mary Ellen Fairfield,
VORYS, SATER, SEYMOUR & PEASE LLP, Columbus,
Ohio, for Appellee. **ON BRIEF:** Paige A. Martin, PAIGE A.
MARTIN CO., L.P.A., Columbus, Ohio, for Appellant. Mary
Ellen Fairfield, Douglas R. Matthews, VORYS, SATER,
SEYMOUR & PEASE LLP, Columbus, Ohio, for Appellee.

1

MERRITT, J., delivered the opinion of the court, in which MOORE, J., joined.  BOGGS, J. (pp. 14-17), delivered a separate opinion concurring in part and dissenting in part.

————————

**OPINION**

————————

MERRITT, Circuit Judge.  In this sexual harassment case brought by plaintiff Janice Courtney in diversity under Ohio law, there are four issues on appeal: (1) whether her employer, Landair Transport, Inc., a trucking corporation, discriminated against her by creating a hostile work environment and then (2) retaliated against her for complaining about the conduct; (3) whether defendant's action violated Ohio's public policy against discrimination and sexual harassment in the workplace; and (4) whether defendant's actions resulted in intentional infliction of emotional distress.  The court below granted summary judgment for defendant on all issues.  We conclude that there is a material dispute of fact as to issues two and three and therefore reverse and remand for further proceedings.

**I.  Facts**

Due to the parties' disagreement on what the record shows, we have included citations to sources in the record from which we compiled our statement of facts.  During her employment with Landair, plaintiff alleges that she was subjected to a hostile work environment based both upon the conduct of supervisors and the conduct of two other truck drivers, Virgil Mizner and James Jarrett, who were independent contractors for defendant Landair.  Her problems began shortly after she began working for Landair in March 1996.  She alleges that on several occasions James Jarrett stuck his tongue out at her making sexual gestures and suggested that plaintiff should ride with him in his truck.  If she did so, Jarrett remarked that he would hire someone else to do the driving because he and Courtney would be "busy in the back" of the truck.  (Courtney Dep. at 187-93; J.A. at 215-

21; Letter from Courtney to Howard, Zeroski of 5/5/96, at 2; J.A. at 150.)  In addition, defendant's Columbus terminal manager approached plaintiff early in her employment to inform her that she was not appropriately dressed and that she was distracting other employees by showing too much cleavage.  (Courtney Aff. ¶ 5; J.A. at 146.)

In response to these incidents, plaintiff wrote a letter dated May 5, 1996, to Gerald Howard, one of Landair's vice-presidents, and Craig Zeroski, who ran the Columbus terminal, complaining to them about the reprimand she received and a "double standard" she believed existed in the treatment of men and women at work.  (Letter from Courtney to Howard, Zeroski of 5/5/96, at 1; J.A. at 149.)  In this letter, she complained that office personnel copied offensive and lewd pictures as jokes for male drivers and also complained about Jarrett's offensive tongue gestures and remarks that she should be his driving partner so that they could have a sexual relationship.  (Letter from Courtney to Howard, Zeroski of 5/5/96, at 2; J.A. at 150.)  Plaintiff ended her letter by stating, "I'm not going to take the harassment from drivers, etc. anymore.... I'm a good asset to this company and have a good reputation as far as my job performance!"  (Letter from Courtney to Howard, Zeroski of 5/5/96, at 3; J.A. at 151.)  No action was taken by defendant Landair at this time.

Plaintiff also alleges that she experienced harassment from Virgil Mizner.  In her deposition, she describes an occasion, although no date is given, when she was walking with Mizner and her partner, Sam Helber, in a parking lot and Mizner allegedly bumped his whole body into plaintiff, continually bumping her breast.  (Courtney Dep. at 197-198; J.A. at 222-23.)  It was not until later that plaintiff felt that his actions were intentional.  (Courtney Dep. at 198; J.A. at 223.)  She describes another incident that occurred in July 1996, in which Mizner approached plaintiff from behind and tried to touch her left breast.  (Courtney Dep. at 198-207; J.A. at 223-31.)  After plaintiff backed away, Mizner asked, "What's the matter?  You're not going to let me touch it?"  (Courtney Dep. at 208; J.A. at 232.)  She further alleges that in October

1996, when plaintiff was alone in the break room, Mizner tugged on her shirt and asked if she was mad at him. (Courtney Dep. at 215-16; J.A. at 233-34.) Finally, plaintiff also alleges that in November 1996, at the Columbus terminal, in the break room, Mizner crept up behind her, blew air in her ear, and laughed at her. Plaintiff responded by yelling, "Virgil, leave me the f--k alone!" Other drivers in the room laughed and remarked aloud, "Getting kind of testy, aren't we?" (Courtney Dep. at 218; J.A. at 236.)

Due to the incidents of harassment and management's alleged refusal to address plaintiff's complaints, plaintiff hired a lawyer. On December 4, 1996, plaintiff's counsel wrote a letter to the defendant management in Columbus asking it to stop the harassment of her client. That same day, the terminal manager of defendant's Indianapolis terminal, Dave Blevins, wrote plaintiff a letter. (Letter from Blevins to Courtney of 12/4/96; J.A. at 165.) The letter stated:

> ... As I told you, [defendant] is committed to maintaining an environment that is free from all forms of harassment, including sexual harassment. This is not always easy to do in the trucking business.
>
> As we discussed, it is my intention to confront the individuals that you identified in your letter and make certain that they understand that this type of behavior will not be tolerated by [defendant]. During today's telephone conversation, I asked you if there were any other individuals and you indicated that there were not. After I have the opportunity to talk to these individuals, I will be back in touch with you. In the meantime, please contact me immediately if there are any other issues related to this situation that you wish to bring to our attention. (Letter from Blevins to Courtney of 12/4/96; J.A. at 165.)

On December 11, 1996, defendant Landair released a memorandum to all owner-operators about Landair's commitment to a harassment-free environment. (Mem. from Queen, Woods to Owner-Operators of 12/11/96; J.A. at 166.)

judgment, on this record, that cannot be enough. Otherwise, when an employee has made a complaint that has been handled satisfactorily, the company must thereafter treat any problem with that employee in a particularly tender fashion, lest a panel such as ours find that they must incur great expense and risk even greater liability for taking action when there is not the slightest evidence that they would not have taken the same action against any other employee who had written in the same vein.

I believe this result is not correct under our standard for evidence sufficient to defeat summary judgment by making a showing of a pretext, and I therefore respectfully **DISSENT.**

-- It could ignore the letter, but keep it in the file. This would be almost as bad for the company. It may be a sad fact of life, but if she were to be in an accident, however blamelessly, the letter would be discoverable, and there would a very good chance that some other court would allow it to be shown to a jury as evidence of gross negligence, willful and wanton activity, recklessness, or other principles that can lead to enormous punitive damages.

-- It could have investigated further – apparently the court's preferred option, and apparently the only way Landair could have perhaps avoided having this claim go to jury. But what end would such an investigation actually have served?

1)  If Courtney had reacted as she now says in her affidavit (18 months after the fact), the court apparently thinks the company might have (or should have) kept her. Now, matters are twice as bad from a liability standpoint, because it can be said that the company *knew* Courtney's attitude was sufficiently dangerous that it should investigate – "and they still did nothing." Any tort lawyer would love to have such a company action in her trial binder.

2)  Alternatively, after hearing Courtney's explanations, (which might or might not have been as anodyne as her affidavit suggests) the company might still have fired her. But now they've heard her side and still fired her, so their prospects of defeating a discrimination or retaliation claim may now be even bleaker.

The trucking company may not have been the most sensitive employer in the country. Maybe in a world with a better tort system, a company would not feel obliged to take such a communication so seriously. But, what evidence is there that the company did not take seriously disturbed or threatening communications from any of its drivers? There is none. Or that the company action was in any way related to the previous harassment complaint, which the company handled exactly as we would hope a responsible employer would. Again, none other than the proximity in time. In my

Defendant states that the timing of the memorandum was designed to address plaintiff's complaints of sexual harassment. (Woods Dep. at 45-46; J.A. at 192.)

From the record, it appears that further harassment from Mizner or Jarrett ceased. Then on January 3, 1997, while plaintiff and Helber were in Columbus waiting to make their run, defendant Landair informed plaintiff and Helber that they were not to return to Seattle because management had decided that another driver should take their route. Plaintiff charges that the assignment change was retaliation for her sexual harassment complaints. Defendant claims it did not pull plaintiff and Helber from their route because of a retaliatory motive, but rather pulled them because of normal holiday interruptions that occur in the trucking business. Because of her route change, plaintiff sent two communications to N. Jeffrey Woods, vice president of operations for Landair, complaining of the change. Woods responded by a telephone conference with plaintiff and Helber in which he gave them the option of becoming Indianapolis-based drivers and keeping the route to Seattle.

On January 12, 1997, plaintiff wrote a letter to Dave Blevins, the Indianapolis terminal manager, protesting the treatment she and Helber received the week earlier and indicated that she believed the treatment by defendant was retaliatory in nature. (Letter from Courtney to Blevins of 1/12/97, at 6-7; J.A. at 78-79.) After detailing the route change, plaintiff wrote in part:

Makes you wonder if all the so called misunderstandings weren't retaliation or pay back.

. . . .

The[re] is no way you could understand, or that I could beg[i]n to convey the Anger, Rage, or Hostility, along with the Headaches, upset stomachs I've been dealing with [sic].

Not to mention the Resentment I feel towards Landair Management.

You all keep saying your [sic] glad they drive for owner-op[erator]s.

Well there's one important thing you all seem to forget. I'm a Company Driver. And as a Company Driver, I depended on the Management of LandAir [sic] to protect me from the unwanted actions from the 2 old men I reported. Who by the way are old enough to be my father [sic]. The thought of them is sickening and disgusting. Instead, my complaints went unanswered. So for nine months I endured the crap. Yes, I'm angry.

.  .  .  .

I need to have this problem taken care of be for [sic] it gets out of hand and I end up hurting someone.

Sincerely, Janice Courtney

.  .  .  .

I've held my tongue for almost a year. NO More. (Letter from Courtney to Blevins of 1/12/97, at 6-11; J.A. at 78-83.)

Blevins forwarded the letter to Woods and after reading the letter, Woods terminated plaintiff's employment. Woods stated in an affidavit that he "became concerned about [plaintiff's] competence to drive [defendant]'s trucks." (Woods Aff. ¶ 3; J.A. at 84.) Plaintiff operated semi-trucks weighing 80,000 pounds on public roadways and Woods concluded that plaintiff posed a potential risk to the general public. (Woods Aff. ¶¶ 3, 5; J.A. at 84-85.) Additionally, Woods stated that he became concerned that even if plaintiff did not pose a risk to the general public, any accident involving the plaintiff could result in liability if an injured party obtained the January 12 letter in plaintiff's personal file. (Woods Aff. ¶ 4; J.A. at 85.) Woods telephoned plaintiff and

This was over a month after her effective complaint about her treatment, and also more than a month after effective action was taken and harassment ceased. It was also more than a week after she had been assured that she could retain her preferred run to Seattle, so long as that business was available to the company. The company in no way encouraged, demanded, or stimulated the sending of the letter.

The letter can certainly be characterized as hostile and upsetting. In addition to the language quoted by the court, it also contains six pages of detailed complaints about her woes with particular FedEx loads over the holiday period and her anger at not being given a particular Coca-Cola load on January 3. This is followed by two pages of general grievances about management's style, (noting that she is "going to seek help from a therapist" and that "right now I'm not really happy with you all") before segueing into three pages of complaints about the previous sexual harassment (including that "my attitude towards my job and my personal life has gone in the toilet") and concluding with the quoted threat. It then adds the notation that she lost all of her meat when she found the electricity and heat out and trees felled at her house when she returned from the holiday run.

The question for our determination, and the question on which I part company with my colleagues, is whether there is sufficient evidence to convince a reasonable jury that Landair's reaction to this letter was simply a pretext for discrimination. Even if the company's action was ill-advised, or overly cautious, it cannot be subjected to a trial on this issue unless there is adequate evidence of pretext.

Consider the company's options:

-- It could destroy Courtney's letter and consider the matters resolved, as indeed they appear to have been. This would have been very ill-advised. The company was certainly correct in believing that if she were in an accident and testified that she sent such a letter, it could have caused catastrophic liability for the company.

---

## CONCURRING IN PART, DISSENTING IN PART

---

BOGGS, Circuit Judge, concurring in part and dissenting in part. The court's opinion correctly sets out the facts and the applicable law in this case. I concur in all of the opinion, except parts III and IV, concerning the plaintiff's retaliation claim under Ohio discrimination law and her claim for wrongful discharge as an Ohio public policy tort.

As the opinion well describes, Janice Courtney was subjected to reprehensible behavior by several of her co-workers. However, when these matters were brought to the attention of the proper management channels, very prompt action was taken, and no further harassment took place.

It is undisputed that friction arose between Courtney and Landair over a change in run assignment,[1] but that change, in itself, is not considered by the court as an incident of unlawful retaliation. The crux of the matter is the company's reaction to an 11-page handwritten letter Courtney sent to Blevins, the Indianapolis terminal manager, on January 12, 1997.

---

[1] There were apparently two sources of friction. Courtney's handwritten letter complains of not being given a "Coca-Cola" load on January 3, which would have filled in some time before the normal run back to Seattle would have begun on Sunday, January 5. Apparently this run, which was not a regular run for Courtney, was given to another driver who could use it to get home.

The controversy over the projected (and never implemented) change in the regular Columbus-Seattle run was apparently resolved almost immediately. Courtney admits in her deposition that she received a letter dated January 3 (even before the regular run back to Seattle would have started) confirming that she would retain that run as long as the business was available, in preference to a company proposal to have an owner-operator do the run rather than a company driver. Her handwritten letter a week later does not even refer to this matter directly. Her letter does indicate that she did begin the run on January 5, and paragraph 14 of her affidavit is to the same effect.

---

informed her that based upon her letter, her "competency as a driver to the company and the public were at risk." (Woods Aff. ¶ 6; J.A. at 85.) Woods contended that plaintiff's earlier complaints of sexual harassment and retaliation had no bearing on his decision. (Woods Aff. ¶ 5; J.A. at 85.) Following her termination, plaintiff filed this lawsuit.

## II.  Sexual Harassment

Plaintiff brings her claim for sexual harassment due to hostile work environment under Ohio Revised Code § 4112.02, which states that it is an unlawful discriminatory practice:

(A) For any employer, because of the sex ... of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment. OHIO REV. CODE ANN. § 4112.02 (Banks-Baldwin 1999).

Sexual harassment claims under Ohio Revised Code § 4112.02 are subject to the same standards applicable to federal harassment claims brought under Title VII. *See Little Forest Med. Ctr. v. Ohio Civil Rights Comm'n*, 572 N.E.2d 1164, 1167 (Ohio 1991) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)). For hostile work environment cases, courts distinguish between harassment by supervisors or management and harassment by co-workers. *See Fenton v. HiSAN*, 174 F.3d 827, 829 (6th Cir. 1999); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803-04 (6th Cir. 1994). Plaintiff Courtney alleges both kinds in this case.

First, we will address plaintiff's claim of sexual harassment due to a hostile work environment created by supervisors. Plaintiff claims that management discriminated against her because a terminal manager cautioned her as to her inappropriate attire in the workplace. A manager's warning, without more, that plaintiff's clothing is inappropriate in the

workplace is not sexual harassment. Plaintiff fails to show that the terminal manager's comments were anything more than a legitimate concern regarding appropriate dress in the workplace.

Plaintiff also errs in claiming that management's failure to end the co-worker harassment in May 1996 constitutes sexual harassment. In *Fenton v. HiSAN*, 174 F.3d 827 (6th Cir. 1999), a case in which the harassment was committed by a co-worker, we confronted the same issue as presented by the plaintiff in this case. In *Fenton*, the plaintiff brought a Title VII action against her former employer alleging liability for hostile work environment sexual harassment by a co-worker. We concluded:

... In *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998), the Supreme Court again held that an employer's liability in sexual harassment cases is governed by common law agency principles and specifically adopted section 219(2) of the Restatement (Second) of Agency as setting out the governing principles:

"A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

(a)  the master intended the conduct or the consequences, or

(b)  the master was negligent or reckless, or

(c)  the conduct violated a non-delegable duty of the master, or

(d)  the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."

652 N.E.2d 653, 657-58 (Ohio 1997) (quoting H. Perritt, *The Future of Wrongful Discharge Claims: Where Does Employer Self Interest Lie?*, 58 U.CIN.L.REV. 397, 398-99 (1989)).

We agree with the court below on its findings of law that a clear public policy against harassment exists and that it could be jeopardized if the court allowed termination of the plaintiff under the circumstances. With regard to the third and fourth elements, though, we part with the court below and agree with plaintiff that the court usurped the role of the fact-finder by deciding on summary judgment that there was an overriding legitimate justification for plaintiff's discharge. For the reasons stated in section III above, plaintiff has presented a genuine issue of material fact as to whether she was discharged for her complaints of sexual harassment or for her purported incompetence and instability and defendant's fear of liability. We therefore reverse the district court's grant of summary judgment on this issue.

## V.  Intentional Infliction of Emotional Distress

Last, as to plaintiff's cause of action for intentional infliction of emotional distress, we agree with the court below and find that plaintiff has failed to present sufficient evidence as a matter of law to create an issue of material fact to sustain her claim. We thus affirm the grant of summary judgment for defendant on plaintiff's claim of intentional infliction of emotional distress.

\* \* \*

After review of the record below, we reverse the grant of summary judgment for the defendant on plaintiff's claims of retaliation and the public policy tort of wrongful discharge and remand those claims to the district court for determination by a fact-finder. We affirm summary judgment for the defendant on plaintiff's claim of sexual discrimination by creation of a hostile work environment and her claim of intentional infliction of emotional distress.

highway.  Defendant also believed that even if plaintiff was fit to drive, defendant could still face liability should she have an accident.  Defendant argues that the injured party could use the letter to show that defendant was aware of her problems and failed to address them.

Defendant did not make any effort whatever to determine what plaintiff meant by her statement that she might "end up hurting someone," and never once asked for an explanation of her statement.  We find this omission to be evidence of an intent to get rid of plaintiff because of her complaints.  Plaintiff's letter can easily be interpreted as a statement simply that she intended to defend herself if touched, bumped, or grabbed by co-workers.  Additionally, at the time of her termination, plaintiff had a three-year safe driving record and no record of violence, instability, or recklessness.  From these facts a reasonable fact-finder might conclude that management simply got mad when it read the letter of complaint about her treatment, grew tired of her complaints, and fired her.

### IV.  Public Policy Tort

Plaintiff on appeal argues alternatively that the district court wrongly granted summary judgment for the defendant on plaintiff's state public policy tort claim for wrongful discharge.  The Ohio Supreme Court has held that a plaintiff must prove the following four elements in order to prevail on a claim of wrongful discharge in violation of public policy:

(1) a clear public policy existed and was manifested in constitutional, statutory or common law;

(2) dismissal of the plaintiff under the circumstances at issue would jeopardize the public policy;

(3) the plaintiff's dismissal was motivated by conduct related to the public policy; and

(4) the employer lacked an overriding legitimate business justification for the dismissal.  *See Collins v. Rizkana*,

RESTATEMENT (SECOND) OF AGENCY § 219(2) (1985) (emphases added).

In *Ellerth*, the Supreme Court concluded that subsection (d)--and specifically the last clause thereof ("or he was aided in accomplishing the tort by the existence of the agency relation")--applies in supervisor harassment cases and therefore does not require a showing of negligence or reckless conduct under subsection (b) in order to bring the case within the supervisor's "scope of employment."  Hence the Court concluded that employers may be held, subject to certain affirmative defenses, vicariously liable in supervisor sexual harassment cases.  *See Ellerth*, 118 S.Ct. at 2267.  But under the Supreme Court's reasoning in *Ellerth*, unlike a supervisor, a coworker does not have power or authority emanating from the employer over the victim.  Therefore, since the "master" does not normally intend or abet the coworker's conduct (subsection (a)) or have a nondelegable duty to prevent it in all circumstances (subsection (c)), the liability of the employer in coworker cases is governed by subsection (b) of section 219(2) of the Restatement (Second) of Agency.  The victim of coworker sexual harassment must therefore prove negligence by the employer.  *See id.*  This standard is consistent with the negligence standard we have previously employed in coworker harassment cases.  In *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872-73 (6th Cir.1997), cert. denied, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998), we stated that in coworker cases the standard is based on a "reasonableness" standard: "when an employer responds to charges of coworker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."

*Fenton*, 174 F.3d at 829.  In this case, just as in *Fenton* and *Blankenship*, plaintiff must show that the defendant knew or should have known of the harassment and failed to take

appropriate remedial action. *See id.* The record shows that defendant took remedial action in December 1996 to address plaintiff's allegations by issuing a memorandum to all owner-operators reiterating Landair's harassment free work environment policy, at which point all harassment towards plaintiff ceased. Plaintiff does not dispute this fact. Instead, plaintiff alleges that defendant knew of the harassment as early as May 1996, but failed to do anything to stop it. She offers as evidence the letter she wrote on May 5, 1996, to Gerald Howard, a vice-president of the defendant, Craig Zeroski, the Columbus terminal manager, and others in which she aired several complaints.

The content of the May 5 letter does not place defendant on notice of Jarrett's and Mizner's harassment. Plaintiff begins her May 5 letter by defending herself and complaining about a double standard she perceived as a result of the reprimand she received regarding more appropriate work clothing. She then complains about several loose sexual references made around the terminal, some of which were directed towards her specifically, but she fails to name the harassers or ask the defendant to do anything in particular about her complaints. She ends her letter again defending her job performance. That was not sufficient to put management on notice that plaintiff wanted it to intervene to stop the co-worker harassment.

Plaintiff also offers as evidence another letter, dated August 10, 1996, sent to Zeroski, the Columbus terminal manager, in which she compiled three logged entries describing more sexual references directed towards her, but again never asked defendant to address the problem. Again, because this correspondence is less than clear as to its purpose, it does not constitute notice to defendant. It was not until December 4, 1996, when defendant received the lawyer's letter asking defendant to stop the harassment, that defendant had notice of the harassment. That same day defendant telephoned plaintiff to discuss her complaints and sent a letter to her detailing their conversation. It was at this point that defendant issued the memorandum to all owner-operators reemphasizing

Landair's anti-harassment policy. With this action, the record shows that all harassment ceased. We agree with the court below that, taking the evidence in the light most favorable to plaintiff, the defendant's conduct was not negligent or indifferent to plaintiff's situation.

### III.   Retaliation

Plaintiff also brings a retaliation claim under Ohio Revised Code § 4122.02. In reviewing retaliation claims, Ohio courts look to federal case law. *See Barker v. Scovill, Inc.*, 6 N.E.2d 807, 809 (Ohio 1983). To support a claim for retaliatory discharge, a plaintiff must show that (1) she engaged in protected activity; (2) she was the subject of adverse employment action; and (3) a causal link existed between the protected activity and the adverse action. *See Chandler v. Empire Chem., Inc.*, 650 N.E.2d 950, 954 (Ohio Ct. App. 1994) (citing *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984)). If the plaintiff meets her initial burden in establishing a prima facie case, then the burden shifts to the defendant to give a legitimate non-discriminatory reason for its action. *See id.* (citing *Burrus v. United Tel. Co.*, 683 F.2d 339, 343 (10th Cir. 1982)). If the defendant gives a non-discriminatory reason, then the plaintiff must show that the articulated reason was only a pretext for the adverse action. *See id.*

Plaintiff Courtney demonstrates a dispute of fact concerning defendant's reason for her termination. Defendant argues that it did not terminate plaintiff because of her sexual harassment complaints, but maintains that it fired plaintiff for remarks made in her January 12, 1997, letter to management. Portions of the letter, defendant argues, show that plaintiff was not in a stable frame of mind: "I need to have this problem taken care of be for [sic] it gets out of hand and I end up hurting someone." (Letter from Courtney to Blevins of 1/12/97 at 10; J.A. at 82.) Defendant argues that it interpreted the letter as indicating that the plaintiff was not fit to drive and that she posed a potential risk to the public because she drove a large, heavy truck that could injure others on the