**Thomas L. MAXWELL, Plaintiff,**

v.

**GTE WIRELESS SERVICE CORPORATION, et al., Defendants.**

**No. 1:99CV541.**

United States District Court, N.D. Ohio, Eastern Division.

Nov. 21, 2000.

Nicholas L. Evanchan, Jr., Kurt Stefan Siegfried, Evanchan & Palmisano, Akron, OH, for Thomas L Maxwell, plaintiff.

Mark S. Floyd, Rebecca J. Dessoffy, Sindy J. Policy, Thompson, Hine & Flory, Cleveland, OH, Carl H. Gluek, Frantz Ward, Cleveland, OH, for GTE Mobilnet, defendant.

## MEMORANDUM AND ORDER

ALDRICH, District Judge.

The plaintiff, Thomas Maxwell, brings this employment discrimination case against the defendants, GTE Wireless Service Corporation ("GTE") and Chuck Schiffhauer, a GTE supervisor. GTE moves for summary judgment, and Maxwell opposes. For the following reasons, this Court grants GTE's motion (doc. # 23) in part and denies it in part. This case is set for trial on February 20, 2001.

### I. Factual and Procedural Background

GTE hired Thomas Maxwell on August 15, 1994 as a retail sales representative. By February 1996, the company had promoted Maxwell to the position of an account executive. In March 1997, Chuck Schiffhauer became Maxwell's immediate supervisor.

In 1996, Maxwell was diagnosed with depression. Maxwell believes that his depression started in 1995 with his separation from his wife, subsequent divorce, and the difficulties of caring for his children as a single father. Maxwell dep. at 46–49. However, Maxwell's depression did not require continuous medication. According to Maxwell, he treated his depression primarily with counseling and used medication only if he was "really feeling bad." Maxwell dep. at 147. Maxwell informed his superiors at GTE of his mental illness. Schiffhauer told Maxwell that he also suffered from depression, which he controlled with medication.

Maxwell's position as an account executive required him to maintain a monthly quota of activations and points. "Activations" are sales which result in the activation of a new cellular or digital phone account. "Points" are credit for the sale of features and programs, such as voice mail or caller identification.

Under GTE's performance guidelines, an account executive must meet 80% of his activation quota and 90% of his points quota each month. The guidelines also

describe a progressive disciplinary procedure should an account executive fail to achieve his or her monthly quota:

Corrective action will consist of three steps:

**Verbal Counseling:**

The first month performance falls below either of the applicable thresholds, Sales Managers will counsel the Commercial Account Executive, ask for commitment for improvement, develop an action plan for improvement, determine any training needs, etc. Verbal discussion should be documented for future reference.

**Written Warning:**

The second month performance falls below either of the applicable thresholds, Sales Managers will present a written warning to the Commercial Account Executive indicating further disciplinary action if performance thresholds are not achieved.

**Termination:**

The third month performance falls below either of the applicable thresholds, termination will result.

*Note: A Commercial Account Executive is subject to disciplinary action up to and including termination if he/she fails to make 50% of either performance quota in any given commission cycle. . . .*

Steps of corrective action will NOT be repeated within a rolling six month period.

Maxwell dep. Ex. 9 at 2.

From 1996 to September 1997, Maxwell satisfactorily performed his duties as an account executive. However, in the fall of 1997, GTE restructured the wireless department and introduced new products and services. Maxwell had difficulty adjusting to the change, and in October 1997, he failed to meet his monthly quotas. Consequently, he was issued a documented verbal warning by his supervisor, Chuck Schiffhauer in early November 1997.

Schiffhauer met with Maxwell in mid-November 1997 to discuss his poor performance. During this meeting, Schiffhauer became upset, yelling at Maxwell and throwing a copy of the GTE presentation manual. Schiffhauer accused Maxwell of being unprepared for his job, and suggested that if he was having difficulty with his depression, he should see a doctor. Maxwell left the meeting emotionally distraught. Schiffhauer followed Maxwell to his car, apologizing for his outburst, stating "I can't let you go. I have got to make sure you are all right." Maxwell dep. at 114.

Maxwell saw his doctor shortly after the meeting. He requested, and was granted a leave of absence from November 18, 1997 through January 2, 1998. Upon his return, Maxwell met with Karen Stetz, a GTE human resources manager, to request a change in supervisor. During this meeting, Stetz noted Maxwell's complaint and assured him that he would not be retaliated against for his inquiry.

Maxwell returned to work on January 2, 1998. However, his performance failed to improve and he fell far short of the sales quotas required. In January 1998, he achieved well below 50% of his activation quota, and in February, he reached only 55% of his activation and 70% of his points quota. Consequently, Maxwell received his second performance warning in March 1998.

On March 10, 1998, Maxwell then took an eight-day leave of absence to care for his son who was sick with pneumonia. GTE adjusted Maxwell's activations quota from 39 to 24 in consideration of this leave. Moreover, GTE emphasized that should Maxwell fail to achieve at least 50% of the adjusted quota, he might be terminated. On March 31, 1998, Maxwell informed Schiffhauer that he would need the following day off, April 1, 1998 to care for his sick son.

On April 2, 1998, GTE determined that Maxwell had recorded only 11 net activations for the month of March, one below

the adjusted 50% quota for the month of March. He was subsequently terminated.

Maxwell filed a charge with the EEOC on October 2, 1998, and received his right to sue letter on January 19, 1999. He filed his complaint on February 9, 1999, which was amended on January 4, 2000. This case was removed to this Court on March 9, 1999.

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to demonstrate the existence of a material dispute as provided in Rule 56(e):

> ... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In determining whether a genuine issue of material fact exists, this Court must view the evidence in a light most favorable to the nonmoving party. *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Determination of whether an issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide whether the evidence is such that "reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Id.* at 252, 106 S.Ct. 2505.

Maxwell seeks recovery against GTE for the following claims: (1) disability discrimination under Ohio and federal law; (2) discrimination and/or retaliation under the Family Medical Leave Act; (3) wrongful discharge in violation of public policy; (4) negligent and intentional infliction of emotional distress; (5) breach of contract; (6) promissory estoppel; (7) breach of implied covenant of good faith and fair dealing. GTE moves for summary judgment on all seven claims. This Court will address the arguments for each claim, viewing the evidence in the light most favorable to Maxwell.

## III. Analysis

### A. Disability Discrimination

In order to establish a disability discrimination claim under the Americans with Disabilities Act ("ADA"), a plaintiff must show the following five elements:

> (1) he or she is disabled, (2) is otherwise qualified for the job, with or without reasonable accommodation, (3) suffered an adverse employment decision, (4) the employer knew or had reason to know of his or her disability, and (5) after rejection or termination the position remained open, or the disabled individual was replaced.

*Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1185 (6th Cir.1996) (interior quotes and citations omitted). If the plaintiff presents evidence of a *prima facie* case, then the defendant may produce evidence of a legitimate non-discriminatory reason for its actions. The plaintiff must then introduce evidence to show that the defendant's reason was a mere pretext for illegal discrimination. *See Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 882 (6th Cir.1996). At all times, the plaintiff bears the ultimate burden of persuasion. *See Monette*, 90 F.3d at 1186. Assuming the facts in the light most favorable to him, Maxwell has sustained this burden under both federal and Ohio law.

Regarding the first element, Maxwell has produced evidence sufficient to establish that his depression was chronic and severe, qualifying as a disability under the ADA. The record indicates that Maxwell requested and received a short medical leave from GTE to treat his depression in 1996, and a six week leave of absence in the fall of 1997. Def.'s Mot. Summ. J. at 17; Maxwell dep. at 103–05, 168. Maxwell's depression returned in the fall of 1999, and he was subsequently placed on disability leave from December 1999 to January 17, 2000 by his new employer, AT & T. Maxwell dep. at 172–75. Moreover, Maxwell presents evidence that his treating doctors have characterized his depression as "bad" and "severe," requiring medication, counseling, and medical leave from work. Maxwell dep. at 41–44, 53–56.

Relying on *Spades v. City of Walnut Ridge*, 186 F.3d 897, 899–900 (8th Cir. 1999) GTE argues that depression treatable by medication and counseling cannot qualify as a disability since it does not substantially limit a major life activity. Def.'s Mot. Summ. J. at 15–16. However, the facts of *Spades* are not analogous to the instant case, as the plaintiff, Sam Spades, could take medication that allowed him to function "without limitation." *Id.* at 900. By contrast, Maxwell's repeated and lengthy medical absences clearly pres-

ent a jury question as to whether *his* depression, albeit treated by counseling and episodic medication, substantially interferes with a major life activity such as working. *See e.g. Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2147, 144 L.Ed.2d 450 (1999) ("Thus, whether a person has a disability is an individualized inquiry.")

Relying on *Polderman v. Northwest Airlines, Inc.*, 40 F.Supp.2d 456 (N.D.Ohio 1999), GTE also argues that Maxwell's depression is insufficiently severe to merit protection. However, the facts of *Polderman* are also clearly distinguishable from the instant case. In *Polderman*, that Court indicated that the plaintiff "suffered from dysthmia, a sort of low grade chronic depression." *Id.* at 462. Moreover, the Court cited the opinion of the plaintiff's treating counselor, who stated: "[T]he thing I want to make very clear is my feeling that Holly's illness was not very severe at all ... it did [not] make her unable to perform activities of daily living." *Id.* In this case, Maxwell has presented evidence that his treating counselors characterized his episodes of depression as "severe" and "bad." Maxwell dep. at 41–44, 53–56. As such, a jury could reasonably determine Maxwell's illness was a disability meriting protection under the ADA.

As to the other elements, GTE does not dispute, and the evidence shows, that Maxwell satisfies the other four elements of disability discrimination under *Monette*. *See Monette*, 90 F.3d at 1185 Consequently, Maxwell has produced evidence sufficient to establish a *prima facie* case of discrimination.

In turn, GTE argues that Maxwell's termination was not due to his disability, but to his poor performance as an account executive. Under GTE's performance guidelines, failure to achieve 80% of monthly activation quotas or 90% of points quotas three times in a six month period is just cause for termination. Maxwell dep. Ex. 13. Moreover, GTE may terminate an

account executive immediately for failing to achieve 50% of the monthly quota. From the six month period of October 1997 to March 1998, Maxwell failed to achieve his performance quotas four times: October 1997, January 1998, February 1998 and March 1998. In the same six month period, Maxwell failed to achieve 50% of his performance quotas twice: January 1998 and March 1998.

GTE also presents evidence that Maxwell was repeatedly warned about his poor performance. In November 1997, he received a documented verbal warning when he failed to achieve his monthly quotas. Maxwell dep. Ex. 13. This was followed by the November 1997 meeting in which Schiffhauer admonished Maxwell for his poor preparation at work. Maxwell dep. 112–14. Upon his return from medical leave, Maxwell fell far below the 50% threshold in January 1998. In February 1998, Maxwell again failed to achieve his performance quota and was issued a second, written warning. Maxwell dep. Ex. 5. In March, Schiffhauer again held a meeting with Maxwell to counsel him concerning his sales strategies and boost his performance. Maxwell dep. Ex. 12. Moreover, Maxwell was warned that should he fail to achieve 50% of his performance quotas in March 1998, he might be terminated. Maxwell dep. Ex. 7.

Finally, GTE presents evidence that its disciplinary procedures were consistently enforced. At least four other account executives were terminated for failure to meet their performance quotas. Stetz dep. at 52; Maxwell Dep. at 186–88. Of these four account executives, three worked in the same group and under the same supervisor as Maxwell, failed to meet 50% of their performance quotas, and were subsequently terminated near the time of Maxwell's termination. *See* Stetz dep. at 52. Under such circumstances, GTE has presented evidence sufficient to rebut Maxwell's *prima facie* case of discrimination. *Compare Summerville v. Esco Co. L.P.*, 52 F.Supp.2d 804, 814 (W.D.Mich. 1999) (employees that dealt with same supervisor, subject to the same standards and engaged in the same conduct are similarly situated for the purposes of determining pretext for discrimination (*citing Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992))).

Maxwell responds by arguing that these legitimate reasons for termination are a mere pretext since GTE improperly calculated his activations for the month of March. Maxwell first argues that his 15 "gross" activations were above 50% of his adjusted quota of 24 activations for the month of March. However, Maxwell's own records indicate that four of the activations were subsequently deactivated, resulting in only 11 "net" activations. Pl.'s Mot. Summ. J.Ex. 13; Braun aff. at ¶ 6. Moreover, GTE presents evidence that "net" and not "gross" activations are the correct measure for determining the monthly quota. Braun aff. at ¶ 5–6. Though Maxwell vigorously contests that "gross" and not "net" activations are the correct measure, he presents no evidence to buttress his claim. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (stating parties must go beyond the pleadings and produce some type of evidentiary material in support of their position).

Maxwell also argues that Schiffhauer incorrectly calculated his adjusted quota for the month of March. He claims that since he worked only thirteen days due to family sick leave, and his monthly quota for "gross" voice activations was 36, he should be responsible for only 21.27 voice activations for March.[1] However, GTE employment guidelines clearly note that monthly activation quotas should include both voice and data. As such, an account executive is responsible for having 39 "net" activations in a month (33 voice, 6 data). Maxwell's

---

1. 36 "gross" voice activations × 13 days worked ÷ 22 work days in March = 21.27 adjusted gross activations.

dep. Ex. 3. Consequently, Maxwell's adjusted "net" activations for March should have been 23.[2] Under such a calculation Maxwell still fails to achieve 50% of his adjusted monthly quota.

Though Maxwell's arguments concerning GTE's allegedly incorrect calculations are unsubstantiated, he does present some evidence to rebut GTE's otherwise legitimate reasons for termination. Maxwell presents the affidavits of two GTE employees as evidence that his termination was not due to his performance, but due to his frequent absences from work. Both Brenda Booth and Debby Sickafoose, co-workers of Maxwell, aver that Schiffhauer was critical of Maxwell's frequent absences. Booth aff. attach. Pl.'s Resp. Def.'s Mot. Summ. J.Ex. 6 at ¶ 4 ("Booth aff."); Sickafoose aff. attach. Pl.'s Resp. Def.'s Mot. Summ. J.Ex. 15 at ¶ 4–6 ("Sickafoose aff."). Booth and Sickafoose also state that Schiffhauer frequently harassed Maxwell by yelling and making derogatory comments about him. Booth aff. at ¶ 3–5; Sickafoose aff. at ¶ 3–6. Moreover, Booth avers that Schiffhauer was specifically critical of Maxwell's frequent medical absences. Booth aff. at ¶ 4.

Although the question is close, given the applicable summary judgment standard, this Court determines that such evidence is sufficient to establish a jury question in the Sixth Circuit. In determining whether impermissible factors played a sufficient role in termination under the ADA, the Sixth Circuit has yet to endorse either of two prevailing tests: (1) a "but-for" analysis or (2) a more lenient "mixed-motive" analysis. See Dockery v. City of Chattanooga, No. 96–630, 134 F.3d 370, 1997 WL 809979, at *2–4 (6th Cir. Dec. 23, 1997); Simpkins v. Specialty Envelope, Inc., No. 95–3370, 1996 WL 452858, 1996 U.S.App. Lexis 22327, at *14 n. 1 (6th Cir. Aug. 9, 1996). Though this Court recognizes that Maxwell fails his burden on a "but-for"

analysis, we cannot determine that no reasonable juror could find for Maxwell on a "mixed-motive" analysis.

Using a "but-for" analysis, Maxwell must show that GTE terminated his employment solely because of his disability. See Dockery, No. 96–630, 134 F.3d 370, 1997 WL 809979, at *3; see also Monette, 90 F.3d at 1178. Given Maxwell's consistently poor performance from October 1997 to March 1998; GTE's documented use of its progressive disciplinary procedures; the numerous warnings issued to Maxwell concerning his performance; and the termination of similarly situated, poorly performing account executives, no reasonable juror could find that Maxwell's depression was a "but-for" cause of his termination.

Under a "mixed-motive" analysis, however, both legitimate and illegitimate, discriminatory factors may play a role in the adverse employment decision. See Dockery, No. 96–630, 134 F.3d 370, 1997 WL 809979, at *2. However, recovery is still barred if the employer "would have made the same decision, even if it had not allowed [an impermissible factor] to enter into the decision-making process." See id. In this case, Maxwell has presented evidence sufficient to establish a jury question as to whether Schiffhauer used discriminatory or illegitimate factors in his decision to terminate Maxwell. See e.g. Booth aff. ¶ 2–5; Sickafoose aff. ¶ 3–6; Maxwell dep. at 227–28 (describing Schiffhauer's frequent admonishments to "take his medication"). This Court also recognizes that Maxwell's consistently poor performance from October 1997 to March 1998; GTE's documented use of its progressive disciplinary procedures; the repeated warnings issued by GTE management concerning his performance; and GTE's termination of similarly situated, poorly performing account executives, establish that GTE has also presented legiti-

---

**2.** (33 voice activations + 6 data activations) × 13 days worked ÷ 22 work days in March = 23.04 adjusted activations.

mate reasons for termination. However, this Court cannot determine that the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

This Court's decision is illuminated by *Dockery*. In that case, the plaintiff, Randy Dockery, was a police officer who suffered from post traumatic stress syndrome. *Dockery*, No. 96–630, 134 F.3d 370, 1997 WL 809979, at *1. After a series of disciplinary violations, Dockery was eventually terminated for attempting to steal a cart of groceries from a store. *Id.* The Sixth Circuit, applying a "mixed-motive" analysis noted that "Employers must be allowed to terminate employees on account of misconduct irrespective of whether the employee is handicapped." *Id.* at *3. Moreover, that Court also stated "[I]t would be a cause of great consternation if any police department did not fire an officer caught red handed in the act of stealing." *Id.* Consequently, that Court affirmed the district court's dismissal of Dockery's claim. *Id.*

In this case, Maxwell's poor performance as an account executive does not establish a similar irrefutable conclusion that GTE would have terminated him even without the use of illegitimate or discriminatory factors. Simply stated, this Court cannot determine that without Maxwell's frequent and lengthy medical absences due to his disability, his poor performance as an account executive would not be overlooked. Indeed, evidence of harassment by Schiffhauer over a six month period, along with the affidavits presented by both Booth and Sickafoose, present a jury question as to whether Maxwell's termination was precisely *because* of his medical absences due to his disability.

Because Maxwell presents evidence sufficient to establish that GTE's non-discriminatory reasons for termination were merely pretextual, this Court denies GTE's motion for summary judgment on the ADA claim.

Since the analysis of GTE's motion for summary judgment on the ADA claim also applies to Maxwell's claim for handicap discrimination under Ohio Revised Code § 4112.02, this Court must also deny GTE's motion for summary judgment on that state-law claim. *See Blankenship v. Martin Marietta Energy Sys., Inc.*, 83 F.3d 153, 155 (6th Cir.1996); *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206–7 (1998).

**B. Discrimination and/or Retaliation Under the Family Medical Leave Act ("FMLA")**

The FMLA permits an eligible employee to take up to twelve weeks per year of medical leave to care for the serious health conditions of a spouse, child or parent. 29 U.S.C. § 2612(a). A serious health condition is an illness, impairment, or condition that involves (1) inpatient care and subsequent treatment associated with such care, or (2) continuing treatment for, among other things, a period of incapacity, a chronic condition, or a threatening ailment requiring multiple treatments. *See* 29 C.F.R. § 825.114. Any violations of the FMLA or the regulations interpreting the Act "constitute interfering with, restraining, or denying the exercise of rights protected by the Act," and are prohibited. 29 C.F.R. § 825.220(b). The FMLA also provides eligible employees with a civil cause of action for an employer's interference with an employee's rights guaranteed by the FMLA or for an employer's discrimination against an employee for opposing any practice made under the Act. 29 U.S.C. §§ 2615(a), 2617(a).

■ In order to establish a *prima facie* case of FMLA retaliation, Maxwell must show that:

(1) [he] availed [himself] of a protected FMLA right, (2)[he] was adversely affected by an employment decision; and (3) there is a causal connection between the two actions.

*Polderman,* 40 F.Supp.2d at 465. Moreover, the burden shifting applicable to disability discrimination is also applicable to FMLA discrimination and retaliation claims. *See Petsche v. Home Fed. Savings Bank, N. Ohio,* 952 F.Supp. 536, 537–38 (N.D.Ohio 1997).

As to the first element of the FMLA claim, Maxwell clearly availed himself of a protected FMLA right when he requested leave to care for his child on March 10, 1998 and again on March 31, 1998. As to the second element, Maxwell has also clearly suffered an adverse employment decision in his termination.

As to the third element, GTE argues that Maxwell presents no evidence of a causal connection between his frequent absences and subsequent termination, save the temporal proximity between the two events. Relying, on *Stubl v. T.A. Systems, Inc.,* 984 F.Supp. 1075, 1090 (E.D.Mich. 1997), GTE states that "temporal proximity ... is not, by itself, sufficient to establish the requisite causal connection." Def.'s Mot.Summ.J. at 27. GTE's reliance on *Stubl,* however, is mistaken. That Court noted that in the Sixth Circuit, temporal proximity is a factor that can establish a causal connection, especially when the adverse action occurs within "a few days or weeks" of the exercise of the FMLA right. *Id.* at 1090. Moreover, GTE ignores the well established precedent that when "discharge [takes] place on the heels of protected activity" evidence demonstrating such a connection "is generally enough to satisfy the third element of the prima facie test." *King v. Preferred Technical Group,* 166 F.3d 887, 893 (7th Cir.1999).

■ In any event, Maxwell presents direct evidence of a causal connection between the FMLA leave to care for his son, and his termination. As noted earlier, Sickafoose avers in her affidavit that Schiffhauer made complaints concerning Maxwell's absences. Sickafoose aff. at ¶ 2–5. Sickafoose also avers that those complaints were made specifically in relation to Max-

well's absences to care for his child, and that Schiffhauer was "going to get [Maxwell] out of here behind [Maxwell's] back." *Id.* at ¶¶ 4–5. Given such evidence, Maxwell has established a *prima facie* case.

GTE counters that Maxwell's termination was based not on his absences, but on his poor performance as an account executive. For reasons noted earlier, evidence of Maxwell's poor performance as an account executive is sufficient to rebut the FMLA discrimination/retaliation claim.

Maxwell's arguments that GTE's proffered legitimate reasons for termination are a mere pretext mimic the arguments offered in his disability discrimination claim. Unlike claims involving the ADA, this Court could find no statements by the Sixth Circuit concerning the applicability of a "but-for" or "mixed-motive" analysis in situations where legitimate reasons for termination are intermingled with other illegitimate, discriminatory reasons. District courts, however, have previously applied both a "but-for" and a "mixed-motive" analysis in FMLA discrimination claims. *See Stubl v. T.A. Systems, Inc.,* 984 F.Supp. 1075, 1091 (E.D.Mich.1997) ("A plaintiff can prove pretext [in an FMLA claim] 'by showing that the Company's reasons have no basis in fact, or if they have a basis in fact, by showing that they were not really factors in motivating discharge, or, if they were factors, by showing that they were jointly insufficient to motivate the discharge." (*citing Ridenour v. Lawson Co.,* 791 F.2d 52, 56 (6th Cir.1986))). Consequently, Maxwell's arguments that GTE's proffered reasons are a mere pretext for discrimination are sufficient to withstand summary judgment for the reasons similar to those given to establish pretext under the ADA. In sum and substance, under a "mixed-motive" analysis, a reasonable trier of fact could conclude that Maxwell was terminated not for his poor performance as an account executive, but because of his absences under the FMLA.

This Court's decision is illuminated by *King*, 166 F.3d 887. In that case, the plaintiff, Regina King, was terminated one day after she completed her FMLA leave. *Id.* at 893. The employer rebutted the *prima facie* case by showing that King's termination was due to a violation of the attendance policy, rather than the exercise of a protected right. *Id.* However, King presented affidavits averring that the employer's reasons for termination did not deal with a violation of the attendance policy, but with missing documentation that a supervisor allegedly tampered with in order to facilitate her discharge. *Id.* at 894. Under a summary judgment standard, the Seventh Circuit noted that such affidavits, along with the "close temporal relationship" between King's request for FMLA leave and her termination, was enough to withstand summary judgment. *Id.*

Similarly, Maxwell was terminated two days after he requested leave under the FMLA. This close temporal relationship between the termination and the exercise of a protected right, coupled with the Sickafoose affidavit that avers that Maxwell was terminated due to his absence to care for his son, establish a jury question concerning FMLA discrimination/retaliation.

Consequently, this Court denies GTE's motion for summary judgment on the FMLA claim.

## C. Wrongful Discharge in Violation of Public Policy

In *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (Ohio 1990), the Ohio Supreme Court recognized an exception to the employment at-will doctrine when the employee is discharged in violation of clear public policy. The elements of the tort are:

(1) That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element). (2) That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize public policy (the *jeopardy* element). (3) The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element). (4) The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Kulch v. Structural Fibers, Inc.* 78 Ohio St.3d 134, 677 N.E.2d 308, 321 (Ohio 1997). The clarity and jeopardy elements of this tort are questions of law to be determined by the court. *Id.* The causation and overriding justification elements are questions of fact to be determined by the trier-of-fact. *Id.*

■ Concerning the first element, GTE argues that a violation under the ADA, Ohio Rev. C. § 4112.02 or the FMLA does not qualify as a violation of clear public policy. However, such a finding contradicts *Kulch*, in which the Ohio Supreme Court stated "[T]here is no question ... that clear public policy may be ascertained from a statutory provision." *Kulch*, 677 N.E.2d at 320–21. Similarly, courts in the Sixth Circuit and this district have found that the ADA, O.R.C. § 4112.02, and the FMLA satisfy the clarity element. *See Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 939 (6th Cir.2000) (wrongful discharge in violation off public policy can be maintained in reference to Ohio Rev. C. § 4112.02 or the ADA); *Dorricott v. Fairhill Center For Aging*, No. 98–3671, 187 F.3d 635 (table), 1999 WL 591453, at *4 (6th Cir. July 27, 1999) (the FMLA "demonstrates a clear policy of protecting longer-term employees"); *Arthur v. Armco, Inc.*, No. 99–CV–133, slip op. at 5, 2000 WL 1072478 (E.D.Ohio March 7, 1999) (despite cases to the contrary, the FMLA is a sufficiently clear statutory announcement of public policy under *Kulch* to permit recovery under wrongful discharge in violation of public policy) (Sargus, J.).

Concerning the second element, assuming that Maxwell's dismissal was due to his disability or to the exercise of his FMLA right, the public policy expressed by the applicable statutes would be jeopardized. *See Courtney v. Landair Transport, Inc.,* 227 F.3d 559 (6th Cir.2000) (jeopardy element satisfied where termination was due to filling of sexual harassment complaint); *Kulch,* 677 N.E.2d at 323–324 (jeopardy element satisfied where Ohio policy favoring workplace safety would be compromised if employees were terminated for making complaints to Occupational Safety and Health Administration).

Courts often analyze the third and fourth elements of this tort in tandem. *See Courtney,* 227 F.3d at 566–567; *McKnight v. Goodwill Indus. of Akron, In.,* No. 99CA007504, 2000 WL 1257810, at *6 (Ohio Ct.App. Sept. 6, 2000); *Halk v. Cedarville College,* No. C.A. 97–CA–75, 1998 WL 425597, at *4 (Ohio Ct.App. June 26, 1998). This Court could find no statement concerning the applicability of "but-for" or "mixed-motive" causation concerning either the third or fourth elements. Rather, when both illegitimate, discriminatory reasons (the causation element) and legitimate reasons (the overriding justification element) are intermingled, courts simply note that "the trier of fact is essentially asked to resolve two competing claims of the parties, that is, whether the employee was discharged for reasons that would violate a public policy or whether, instead, the employee was in fact discharged for legitimate business reasons independent of public policy considerations." *Halk,* No. C.A. 97–CA–75, 1998 WL 425597, at *4; *see also McKnight,* No. 99CA007504, 2000 WL 1257810, at *6 ("Finally, we must ask whether appellants' dismissals were motivated by conduct related to public policy and whether [the appellee] possessed an overriding business justification for the dismissal.").

■ Given this analysis, this Court concludes that genuine issues of material fact remain concerning this tort. For the rea-

sons similar to those stated in section A and B above, a reasonable juror could find that GTE based Maxwell's termination on his disability and FMLA protected activity, rather than on his poor performance as an account executive. *See Courtney,* 227 F.3d at 566–67.

Consequently, this Court denies GTE's motion for summary judgment on Maxwell's claim of wrongful discharge in violation of public policy.

## D. Negligent Infliction of Emotional Distress

■ Ohio courts do not recognize a separate tort for negligent infliction of emotional distress in the employment context, with a limited exception involving "actual physical peril." *Tschantz v. Ferguson,* 97 Ohio App.3d 693, 714, 647 N.E.2d 507 (1994); *Criswell v. Brentwood Hosp.,* 49 Ohio App.3d 163, 165, 551 N.E.2d 1315 (1989). Since Maxwell has presented no evidence of actual physical peril, summary judgment is appropriate on this claim.

## E. Intentional Infliction of Emotional Distress

■ In order to withstand summary judgement for intentional infliction of emotional distress, Maxwell must demonstrate genuine issues of material fact concerning each of the following elements:

(1) GTE intended to cause the plaintiff to suffer serious emotional distress;

(2) GTE's conduct was extreme and outrageous;

(3) GTE's conduct was the proximate cause of serious emotional injury.

*See Phung v. Waste Mgt., Inc.,* 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (Ohio 1994). Ohio courts define "extreme and outrageous conduct" as "beyond all possible bounds of decency ... such that it must be considered as utterly intolerable in a civilized community." *Katterhenrich v. Federal Hocking Local Sch. Bd. of Ed.,* 121 Ohio App.3d 579, 591, 700 N.E.2d 626 (1997). Moreover, in the employment

context, "employees must expect to be evaluated, not always favorably; thus questioning, criticism, and discharge of an employee do not constitute outrageous conduct." *Id.*

Given this precedent, Maxwell has failed his burden. Viewing the facts in the light most favorable to him, Maxwell may have felt harassed and singled out by Schiffhauer's statements concerning his poor performance and his illness. Moreover, Maxwell may have been justifiably frightened and upset when Schiffhauer threw a book, yelled at him, and accused him of being unprepared for his job in the November 1997 meeting. While such actions may be evidence of insensitivity, rudeness and poor management, they do not rise to the level of outrageousness required to permit recovery under this claim. *Compare Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1558 (10th Cir.1995) (evidence that supervisor yelled at employee and pushed her down into a chair during the course of an internal embezzlement investigation insufficient to establish outrageousness), *Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir.1991) (evidence that manager screamed and made threatening gestures towards employee insufficient to establish outrageousness).

Consequently, this Court grants GTE's motion for summary judgment on Maxwell's claim of intentional infliction of emotional distress.

**F. Breach of Implied Contract**

Maxwell also seeks recovery under breach of implied contract. In Ohio, at-will employees bear a heavy burden of establishing the necessary elements of contract formation. *See Penwell v. Amherst Hosp., et al.*, 84 Ohio App.3d 16, 21, 616 N.E.2d 254 (1992). In particular, Ohio courts have required "specific evidence to show the parties assented to something other than at-will employment." *Reasoner v. Bill Woeste Chevrolet, Inc.*, No. C–980402, 1999 Ohio App. LEXIS 182, at *7–

*8, 1999 WL 34671 (Ohio Ct.App. January 29, 1999).

In this case, Maxwell claims GTE made two implied promises that were breached: (1) an assurance that he would not be terminated if he made twelve activations for March 1998 and (2) an assurance that he would not be retaliated against for taking leave under the FMLA. Pl.'s Mot.Resp. Def.'s Mot.Summ.J. at 18. However, Maxwell furnishes no evidence that GTE or Maxwell specifically assented to a term of employment based either on the number of activations, or his leaves of absence. Rather, on March 23, 1998, Maxwell received a memo stating that he might be terminated should he fail to achieve 50% of his adjusted quota. Such a promise cannot be considered the introduction of a new term of employment under the circumstances.

Consequently, this Court grants GTE's motion for summary judgment on this claim.

**G. Promissory Estoppel**

In order to establish a claim for promissory estoppel, Maxwell must show:

First ... some representation by the employer which may reasonably be interpreted as limiting the employer's ability to terminate the employee at will. Second ... that he detrimentally changed his position in reliance on that representation. [T]hird ... any reliance by the employee [must be] justified and reasonable.

*Penwell*, 84 Ohio App.3d at 19, 616 N.E.2d 254.

As in his claim of breach of implied warranty, Maxwell claims GTE made two promises: (1) an assurance that he would not be terminated if he made twelve activations for March 1998 and (2) an assurance that he would not be retaliated against for taking leave under the FMLA. Pl.'s Mot.Resp. Def.'s Mot.Summ.J. at 18. Moreover, as noted in the previous section,

the evidence clearly establishes that GTE violated neither promise.

Consequently, this Court grants GTE's motion for summary judgment on this claim.

## H. Breach of Covenant of Good Faith and Fair Dealing

■ Ohio does not "recognize a cause of action for breach of an implied covenant of good faith and fair dealing in the case of a wrongful discharge of an at-will employee." *Stumpf v. Cincinnati Inc.*, Nos. C–960605, C–960632, 1997 Ohio App. LEXIS 5767, at *11, 1997 WL 789401 (Ohio Ct. App. Dec.26, 1997). As such, this Court grants GTE's motion for summary judgment on this claim.

## III. Conclusion

For the foregoing reasons, this Court denies GTE's motion for summary judgment on disability discrimination under the ADA and O.R.C. § 4112.02, discrimination/retaliation under the FMLA, and wrongful discharge in violation of public policy, and grants GTE's motion on all other counts.

This case is set for trial on February 20, 2001. Should this date be inconsistent with previous arrangements, the parties are instructed to contact this Court at the earliest possible convenience.

IT IS SO ORDERED.